Frank D. GALLARDO, Plaintiff,

v.

WESTFAL–LARSEN & CO. A/S, Defendant.

No. C–76–040 WHO.

United States District Court, N. D. California.

June 3, 1977.

Thomas C. Knowles, Boccardo, Blum, Lull, Niland, Teerlink & Bell, San Francisco, Cal., for plaintiff.

Warren W. Wilson, Lillick, McHose & Charles, San Francisco, Cal., for defendant.

ORRICK, District Judge.

This action for damages for personal injuries brought by the plaintiff longshoreman against defendant, Westfal-Larsen & Co. A/S (hereinafter Westfal or shipowner) presents two issues which have received varied and conflicting analyses by courts in other circuits: (1) the appropriate standard of care which a vessel owner owes to an employee of an independent stevedore engaged in cargo operations under the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act (hereinafter cited as LHWCA), 33 U.S.C. § 901 et seq.; and (2) the applicability of the regulations promulgated under the LHWCA, 33 U.S.C. § 941(a), and adopted under the Occupational Safety and Health Act of 1970 (hereinafter cited as OSHA), 29 U.S.C. §§ 655, 657, to establish the negligence per se of a shipowner. For the reasons stated below, the Court modifies the standard of care stated in its previous decision in Ramirez v. Toko Kaiun K.K., 385 F.Supp. 644 (N.D.Cal. 1974), rejects the use of OSHA maritime regulations to establish the negligence per se of a shipowner, and denies plaintiff's claim for damages.

## I. FACTS

Plaintiff was an experienced winch-driver/hatch-tender employed by the Crescent Wharf and Warehouse Company (hereinafter Crescent or stevedore). Westfal was the owner of the S.S. Siranger M/V (hereinafter Siranger). Crescent, under contract with Westfal, dispatched plaintiff and other longshoremen to load and unload cargo aboard the Siranger. During the course of these operations, the plaintiff had occasion to ascend a ladder to the fo'c'sle deck to operate a set of winches which drove cargo cables needed for work in hatch number two. The plaintiff testified that a fifty gallon oil drum at the base and to the starboard side of the ladder blocked his approach and forced him to move to the port to secure a hold for his first steps.[1] After operating the winches, the plaintiff descended the same ladder. As his foot touched the main deck, his shoe allegedly came into contact with a slippery substance which caused him to fall and injure his left knee and left middle finger. The Court received much testimony regarding the nature of the slippery substance, its source, and the shipowner's knowledge of its presence. After careful consideration of all the evidence, the Court finds that the shipowner had neither actual nor constructive knowledge of any dangerous condition beneath the starboard ladder to the fo'c'sle deck before the accident.

The plaintiff concentrated upon three main areas of contention: (1) the adequacy of pre-work inspections on the night of the accident; (2) the safety responsibilities of shipowners, stevedores, and longshoremen during cargo operations; and (3) the precise location of the starboard ladder to the fo'c'sle deck in relation to any appurtenance of the ship or item of cargo loaded during plaintiff's shift which might have shed a slippery substance onto the deck. Plaintiff argued that the shipowner failed to prepare a reasonably safe place to work or, alternatively, that the shipowner prepared a rea-

---

1. The plaintiff offered conflicting statements regarding whether the drum obstructed his ascent or descent of the ladder. The Court as-sumes, for the purposes of this discussion, that the plaintiff had to move to one side while climbing to and from the fo'c'sle deck.

sonably safe place to work but learned of a hazardous condition at the base of the starboard ladder to the fo'c'sle deck during cargo operations which it did not remedy. The plaintiff failed, however to establish the factual bases of his argument by a preponderance of the evidence.

As regards pre-work inspections, the evidence revealed three separate checks of the ship prior to the start of plaintiff's shift. The chief officer (or chief mate) of the Siranger on October 25, 1974, Egil Rokkones, testified by deposition that Westfal ships normally receive a thorough check before entering the first U.S. port on any voyage.[2] Between ports, the crew replaces newly damaged or worn equipment and cleans slippery substances observed on any walking surface. The chief mate customarily oversees each inspection by personally walking the decks.[3] Furthermore the officers aboard the Siranger have a policy of noting any safety violations discovered by ship's personnel or by longshoremen in the deck log, but the pages for the period prior to the accident contained no such entries.

The second and third inspections were made by employees of Crescent. Pieter Suttorp, the stevedore superintendent on October 25, 1974, testified that he normally begins work one hour before the gangs[4] to make a safety check and to familiarize himself with the type of cargo operations which the longshoremen will perform. He stated that the inspection usually consumes a small portion of the time used to prepare for the arrival of the longshoremen and that ten minutes is sufficient to check three hatches.[5] However, Suttorp had no independent recollection of the events of October 25, 1974, at the time of trial, and, therefore, described his check with reference to the Safety Inspection Sheet which he completed for Crescent. The sheet revealed that the lighting, gear, housekeeping (i.e., deck condition), and ladders were satisfactory for work in hatch numbers two, three, and five.[6]

2. The crew inspects all gear and replaces all hazardous equipment such as worn cables and oily ropes. The decks receive a new coat of paint which contains an abrasive component such as sand or crushed shells to improve traction.

3. The chief mate, however, also has a responsibility for preparing cargo plans, and, between ports in close proximity, he will sometimes delegate responsibility for the safety inspections to the bosun. Rokkones had no independent recollection of the voyage to San Francisco but stated that it was of short duration and might have caused him to forego an inspection altogether if no problems had been discovered at the previous port or to ask the bosun to check the decks for safety problems. The bosun for the Siranger on October 25, 1974, had held his post for approximately 12 years, and Rokkones indicated that the bosun had ample experience with the type of check needed to prepare the ship for cargo operations.

4. Gangs usually consist of 10 longshoremen who physically perform the cargo operations. Each gang has a head called the gang boss. The remaining members are called winch drivers, hatch tenders, or holdmen, depending upon the particular task which they perform.

5. The master log of the Siranger indicated that it departed from Wilmington, California at 8:26 p. m. on October 24, 1974. The ship arrived in San Francisco the following evening and set its first mooring for a starboard landing (right side to the pier) at 7:41 p. m. The crew secured the vessel by 7:53 p. m. and three gangs of longshoremen employed by Crescent boarded at 8:00 p. m. to work in hatch numbers two, three, and five.

Assuming that the Siranger was available for boarding at 7:41 p. m. when the crew set the first mooring, Suttorp had 19 minutes to make preparations for which he normally reserves 1 hour. Despite the limited time between the landing and the start of the 8:00 shift, the Safety Inspection Sheet indicates that Suttorp made his customary survey of work areas.

6. Under questioning, Suttorp disclosed that he generally confines his ladder inspections to individual holds and seldom concerns himself with ladders such as those leading to the fo'c'sle deck unless he knows in advance that a longshoreman will need to use a ladder besides those in the holds. The testimony at trial did not reveal that Suttorp had reason to know that a longshoreman would have to drive the fo'c'sle winches at the time of the safety inspection. In addition, Suttorp stated that he might mark housekeeping conditions as satisfactory despite the existence of oil or grease on the decks. The inspection sheet would then contain a comment regarding the need for sawdust or sand, but the sheet for October 25, 1974, contained no qualifying remarks whatsoever.

The walking boss,[7] Foster Ward, made the remaining inspection on the evening of the accident. A walking boss does not customarily prepare a written report of his survey, and Ward had to speak from memory alone. Ward's deposition does not describe the extent of the inspection made on the night of the accident, but Ward stated at trial that he did not check forward of the center of hatch number two.

The record of the case, therefore, contains no conclusive indication that an employee of the stevedore or of the shipowner inspected the starboard ladder to the fo'c'sle deck before the plaintiff boarded the Siranger. Nonetheless, the Court finds insufficient evidence to conclude that either the stevedore or the shipowner failed to inspect the vessel for safety hazards in a manner consistent with custom and practice in the industry.[8]

The testimony at trial regarding safety responsibility confirmed neither plaintiff's view that a shipowner has a continuing duty, coextensive with the duty of a stevedore, to inspect a vessel before and during cargo operations nor Westfal's view that the duty of a ship to make safety inspections ceases when longshoremen begin work. The evidence reveals a less categorical differentiation of responsibilities. For instance, all longshoremen retain some voice in the safe conduct of their work. Suttorp and Ward indicated that if they find an unsafe condition during a pre-work inspection or learn of a hazard during cargo operations, they normally inform a member of the ship's crew and leave the correction to the vessel. Less often, they will direct a longshoreman to resolve the problem (e.g., spread sand or sawdust on slippery substances) without involving the ship. If the unsafe condition poses a threat of injury, they can halt cargo operations until the problem is resolved. The remaining longshoremen who handle cargo do not inspect work areas for safety hazards before or during work. However, every longshoreman should report any unsafe conditions to the gang boss or to the walking boss. Furthermore, a longshoreman may legitimately refuse to work if he has reason to believe that a condition threatens his safety or the safety of his co-workers.

The evidence concerning vessel owners revealed that the officers of ships from many lines, including Westfal, remain safety conscious both before and after the commencement of cargo operations. Rokkones stated that the policy aboard the Siranger was to have the first or second mate (also known as the cargo officer, deck officer, or watch hand) and at least one seaman on deck with the longshoremen whenever work was in progress. The testimony of Rokkones and Suttorp disclosed that the deck officer may become involved in cargo operations in several respects. For example, he may accompany the stevedore superintendent during the pre-work inspection to advise him of the work required in each hatch. Once loading or unloading has begun, the deck officer leaves the immediate supervision of the longshoremen to the walking boss and gang bosses but will walk the deck near the hatches in which people are working to see that the appropriate cargo is removed and that oncoming cargo is properly stowed. If he notices a safety hazard or receives information regarding an unsafe condition, he will normally direct a crewman to correct the problem. In addition, the deck officer retains the authority to suspend cargo operations until a hazard is removed. Rokkones stated that the officer

---

7. The walking boss is the longshoreman having the most immediate supervisory control of the gangs.

8. The Court recognizes that a longshoreman may not recover for the negligence of a stevedore. 33 U.S.C. § 905(b). The Court further recognizes that, in this Circuit, the negligence of a stevedore may not reduce the liability of a shipowner to a plaintiff in any way. *Dodge v. Mitsui Shintaku Ginko K.K., Tokyo*, 528 F.2d 669 (9th Cir. 1975); *Shellman v. United States Lines, Inc.*, 528 F.2d 675 (9th Cir. 1975). The findings of fact with regard to the conduct of the stevedore on the night of the accident, therefore, have no independent legal significance. The Court discusses the conduct of the stevedore as a means of clarifying the respective obligations of a stevedore and a shipowner before and during cargo operations.

on duty may not assume a neutral posture toward safety problems once the longshoremen have commenced work. The officer should actively watch for conditions which may pose a threat of injury to anyone.

■■■ The overlap of safety responsibilities does not compel a conclusion that any employees of Westfal had knowledge of a hazard beneath the starboard ladder to the fo'c'sle deck on the night of October 25, 1974. The Court has already found that the ship met its obligation to inspect for safety problems before the onset of cargo operations. The Court further finds that no officer or member of the ship's crew learned of an unsafe condition near any working area during cargo operations which he failed to rectify.

■ The evidence concerning the precise location of the starboard ladder to the fo'c'sle deck in relation to appurtenances of the ship or to items of cargo which might have shed a slippery substance does not support plaintiff's contention that the ship-owner either caused or had knowledge of a hazardous condition near the site of the accident. The Court received a great deal of testimony regarding the possibility that: (1) the cover to hatch number two could have leaked hydraulic fluid; (2) grease on the rigging or winches could have fallen onto the path which plaintiff followed to and from the winch platform; (3) the long-

shoremen used greased dunnage near the accident site or tracked grease from the hold of hatch number two to the starboard fo'c'sle ladder; (4) the ship's forklifts leaked hydraulic fluid; and (5) the two large items of cargo hoisted aboard before plaintiff's injury (a forklift and a paving machine) dropped grease, hydraulic fluid or oil along plaintiff's route to the winch platform. None of these possibilities withstands scrutiny. The evidence shows that the cover to hatch number two was mechanically, not hydraulically, operated and that the ship's forklifts were not used at all. Furthermore, the Court finds little to support a contention that a longshoreman tracked grease from the hold or that the stevedore used greased dunnage on the main deck.[9] Finally, the Court finds that the rigging, winches, and cargo did not overhang or shed a slippery substance onto the path of plaintiff's ascent to or descent from the winch platform.[10]

## II. LAW

In *Ramirez v. Toko Kaiun K.K., supra,* the Court held that:

"* * * [U]nder the Amendments [to the LHWCA] the defendant ship owner owes to the plaintiffs longshoremen the same standard of care that a land-based owner of a premises owes to a

---

**9.** See note 8, *supra.*

**10.** The evidence concerning the moments immediately after the accident raise additional ambiguities which plaintiff did not sufficiently clarify to justify a finding supporting his version of the fall.

Plaintiff testified in his deposition and at trial that he slipped on grease at the base of the ladder. Yet he did not actually see the grease on the deck or on his clothing but instead noticed a blackish-brown patch of grease on his left shoe after the accident. Plaintiff stated that he then asked the gang boss to summon the walking boss, Foster Ward. Ward testified that, when he responded to the call, the plaintiff pointed to a patch of blue or purple oil on the deck. The oil allegedly formed a trail about 2 feet wide extending from the coaming of hatch number two to the ship's railing. The trail did not pass beneath the base of the ladder at which plaintiff had fallen. Further evidence disclosed that someone had covered the oil

with sand or sawdust immediately after the accident and that Ward did not approach closer than 3 to 6 feet from the substance during his conversation with the plaintiff. However, Ward stated that he had a clear recollection of the scene of the accident and could see the color of the oil through its covering.

The stevedore superintendent, Pieter Suttorp, filed an accident report consisting of a single sentence in which he indicated that the plaintiff had fallen on an "oily deck." Suttorp stated at trial that he probably described the accident using the words of the person who explained the fall to him. However, Suttorp did not recall whether he received the explanation from plaintiff or Ward. Suttorp, therefore, was unable to state which person had referred to the slippery substance as oil. Plaintiff, however, denied ever pointing to a stream of oil or ever describing the cause of his fall as anything other than the grease on his shoe.

business invitee * * *. In this instance, the ship owner must (1) exercise ordinary care to place the ship and equipment in such condition that an experienced stevedore will be able, when exercising ordinary care, to discharge the cargo in a workmanlike manner and with reasonable safety to persons and property, and (2) give the stevedore warning of any concealed or latent defects that are known by the shipowner." *Id.* at. 646.

In the three years since *Ramirez* federal courts have reported more than twenty decisions [11] directed to the standard of care which a shipowner owes to longshoremen engaged in cargo operations within the navigable waters of the United States. Each of these decisions has provided valuable insight into the possible characteristics of the third-party suit which Congress intended to create. In addition, the counsel for the parties to this case have introduced a great deal of testimony regarding safety customs in the shipping industry which was not available to the Court when it last analyzed the 1972 amendments to the LHWCA (hereinafter amendments). Finally, recent commentary in legal journals [12] and admiralty treatises [13] has attempted to outline the elements of a standard of care which not only implements the intent of Congress but which most nearly comports with the actual practices of vessel owners. In light of the accumulation of precedent and comment, the Court has reviewed the proper interpretation of the amendments and has modified the standard of care stated in *Ramirez* as follows:

Before the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual or constructive knowledge. After the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual knowledge.

---

**11.** *Munoz v. Flota Mercante Grancolombiana,* 553 F.2d 837 (2d Cir. 1977); *Hurst v. Triad Shipping Co.,* 554 F.2d 1237 (3d Cir. 1977); *Brown v. Mitsubishi Shintaku Ginko,* 550 F.2d 331 (5th Cir. 1977); *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233 (5th Cir. 1977); *Brown v. Ivarans Rederi A/S,* 545 F.2d 854 (3d Cir. 1976); *Anuszewski v. Dynamic Mariners Corp.,* 540 F.2d 757 (4th Cir. 1976); *Napoli v. Hellenic Lines, Ltd.,* 536 F.2d 505 (2d Cir. 1976); *Dodge v. Mitsui Shintaku Ginko K.K. Tokyo,* 528 F.2d 669 (9th Cir. 1975); *Shellman v. United States Lines, Inc.,* 528 F.2d 675 (9th Cir. 1975); *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31 (3d Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *Landon v. Lief Hoegh & Co.,* 521 F.2d 756 (2d Cir. 1975), *cert. denied, A/S Arcadia v. Gulf Ins. Co.,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976); *Bess v. Agromar Line,* 518 F.2d 738 (4th Cir. 1975); *Burris Global Bulk Carriers,* 505 F.2d 1173 (3d Cir. 1974); *Baker v. Cristobal,* 488 F.2d 331 (5th Cir. 1974); *Teofilovich v. d'Amico Mediterranean/Pacific Line,* 415 F.Supp. 732 (C.D.Cal. 1976); *Cummings v. "Sidarma" Soc.,* 409 F.Supp. 869 (E.D.La. 1976); *Solsvik v. Maremar Compania Naviera, S.A.,* 399 F.Supp. 712 (W.D.Wash. 1975); *Crowshaw v. Koninklijke Nedlloyd, B.V. Rijswijk,* 398 F.Supp. 1224 (D.Ore. 1975); *Frasca v. Prudential-Grace Lines, Inc.,* 394 F.Supp. 1092 (D.Md. 1975); *Fitzgerald v. Compania Naviera La Molinera,* 394 F.Supp. 413 (E.D.La. 1975); *Anuszewski v. Dynamic Mariners Corp.*

*Panama,* 391 F.Supp. 1143 (D.Md. 1975), *aff'd* 540 F.2d 757 (4th Cir. 1976); *Slaughter v. S.S. Ronde,* 390 F.Supp. 637 (S.D.Ga. 1974); *Birrer v. Flota Mercante Grancolombiana,* 386 F.Supp. 1105 (D.Ore. 1974); *Ramirez v. Toko Kaiun K.K.,* 385 F.Supp. 644 (N.D.Cal. 1974); *Citizen v. M/V Triton,* 384 F.Supp. 198 (E.D. Tex. 1974); *Fedison v. Vessel Wislica,* 382 F.Supp. 4 (E.D.La. 1974); *Hite v. Maritime Overseas Corp.,* 380 F.Supp. 222 (E.D.Tex. 1974); *Lucas v. "Brinknes" Schiffahrts Ges.,* 379 F.Supp. 759 (E.D.Pa. 1974).

**12.** Gorman, *The Longshoremen's and Harbor Workers' Compensation Act—After the 1972 Amendments,* 6 J. Maritime L. 1 (1974); Robertson, *Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* 41 Tenn.L.Rev. 773 (1974); Thompson, *Duty Owed by Shipowner Under 1972 Amendments to Longshoremen's Act Is That of Land Based Premises Ower to Business Invitee,* 6 J. Maritime L. 643 (1975); Note, *The Injured Longshoremen v. The Shipowner After 1972: Business Invitees, Land-Based Standards, and Assumption of Risk,* 28 Hastings L.J. (1977).

**13.** G. Gilmore & C. Black, *The Law of Admiralty,* 449–55 (2d ed. 1975); 1A E. Jhirad, *Benedict on Admiralty* §§ 28,111–20 (7th ed. 1973).

The Court now proceeds to examine this standard of care in the context of the legislative history of, and the cases interpreting, the amendments.

### A. *The Legislative Intent Behind the 1972 Amendments.*

In 1972, Congress amended portions of the LHWCA. Act of 1972, Pub.L.No.92–576, 86 Stat. 1251, *amending* 33 U.S.C. §§ 901–50 (1970) (codified at 33 U.S.C. §§ 901–50 (Supp. V, 1975). A number of courts and commentators have analyzed the history and purposes of the amendments which do not require repetition here. *See, e.g., Lucas v. "Brinknes" Schiffahrts Ges. Franz Lange,* 379 F.Supp. 759 (E.D.Pa. 1974); Note, *The Injured Longshoreman vs. The Shipowner After 1972: Business Invitees, Land-Based Standards, and Assumption of Risk,* 28 Hastings L.J. 771 (1977) (hereinafter cited as *The Injured Longshoreman* ). This Court has also had occasion to discuss the problems which the 1972 amendments attempted to resolve and has characterized the balance of interests contained in the new legislation as follows:

"Under the plan as formulated by Congress, the longshoreman lost his claim against the vessel under the warranty of seaworthiness allowed by *Sieracki* [*Seas Shipping Co. v. Sieracke,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946)], and in return was granted much higher compensation benefits. The stevedoring company that employs the longshoreman was forced to pay the higher workmen's compensation benefits, but was relieved of liability from *Ryan* -type [*Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1955)] indemnity suits brought by the vessel. The vessel lost its indemnity rights against the stevedoring company, but had its liability to longshoremen limited to cases where its negligence can be proved." *Ramirez v. Toko Kaiun K.K., supra,* 385 F.Supp. at 650.

The change which affects the present suit concerns the addition of a paragraph to Section 5 of the Act, 33 U.S.C. § 905 (Supp. V, 1975), which states:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

The section itself does not define the standard of care which Congress intended vessels to exercise toward longshoremen, and courts have often referred to the House Report published concurrently with the amendments for guidance. H.R.Rep.No. 92–1441, 92d Cong., 2d Sess. (1972), 3 U.S. Cong. & Adm.News 4698 (1972) (hereinafter cited as House Report). However, the Report also fails to outline the precise rules of negligence which might apply to third-party actions and instead provides general guidelines within which courts are free to fashion an appropriate standard. Nonetheless, many of the decisions which have interpreted the 1972 amendments have quoted portions of the House Report in isolation and have defined the intent of Congress in a manner that does not account for all of the guidelines which the Report contains.

A close reading of the Report reveals that Congress intended any standard of negligence developed under the 1972 amendments to incorporate at least seven considerations: (1) the need to fashion a uniform negligence remedy under Section 5 for all federal courts, House Report, *reprinted in* 3 U.S.Cong. & Adm.News, *supra,* at 4705; (2) the need to promote safety in the longshoring industry, *id.;* (3) the need to place the injured longshoreman in the same position as an employee injured on land, *id.* at 4704; (4) the need to resort to land-based standards of negligence, *id.* at 4702–04; (5) the need to retain the admiralty concept of comparative negligence and to reject the common law rule of contributory negligence, *id.* at 4705; (6) the need to retain the admiralty rule which precludes the defense of assumption of risk, *id.;* and (7) the need to avoid the application of nondelegable duties based upon any category of the pre-amendment doctrine of unseaworthiness, *id.* at 4702–03.

A close reading also reveals that Congress did not make a number of statements for which the Report has been cited. For example, the legislative history does not reject every conceivable form of nondelegable duty. It consistently ties mention of nondelegable duty to discussion of unseaworthiness and leaves open the possibility of a negligence standard which permits use of some nondelegable duties short of liability without fault. *See infra.*

In addition, the Report does not direct courts to consult authority from particular areas of land-based negligence law in order to find the appropriate standard of care for third-party actions under Section 5. For instance, the Report does not specifically recommend use of real property concepts of tort liability. The words "real property" and "property" are not used. It appears that the phrase "land-based" is no more than a descriptive label which connotes the opposite of "sea-based" and which does not specifically mean "property-based." Furthermore, the legislative history does not refer to longshoremen as "business invitees" at any point in its discussion. In fact, the Report contains only one reference to a specific area of tort law during a hypothetical analysis of liability for injuries sustained by longshoremen, shipbuilders, or repairmen employed directly by a vessel. Congress expressed an intent to foreclose suit against the shipowner for all except its personal negligence and suggested an analysis similar to that found in the law of independent contracting relationships. House Report, *reprinted in* 3 U.S.Cong. & Adm.News, *supra,* at 4705. Congress, however, did not equate vessel owners and stevedores with contractors and subcontractors for all purposes.

In sum, the Report contains a number of general comments, no one of which appears to have greater importance than the others. Congress simply provided a loose framework of variables from which to construct the standard of care required of vessel owners in third-party actions. The one section of the history which most nearly resembles a suggested standard of care confirms the interpretation that Congress expected federal courts to promote each of the seven considerations enumerated above. The Report states:

"The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in nonmaritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness', 'nondelegable duty', or the like.

\* \* \* \* \* \*

Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.

So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances. The vessel will not be chargeable with the negligence of the stevedore or employees of the stevedore.

Under this standard, as adopted by the Committee, there will, of course, be disputes as to whether the vessel was negligent in a particular case. Such issues can only be resolved through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties. The Committee intends that on the one hand an employee injured on board a vessel shall be in no less favorable position vis a vis his rights against the vessel as a third party than is an employee who is injured on land, and on the other hand, that the vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances." House Report, *reprinted in* 3 U.S.Cong. & Adm.News, *supra,* at 4703–04.

The Congress has neither suggested nor compelled the adoption of a specific standard already found in an established area of tort law. The history does not bar eclecticism, but any borrowed doctrines would have to satisfy the seven considerations.

### B. *The Post-Amendment Cases.*

A majority of post-amendment cases contain statements or implications not entirely consistent with the legislative history viewed as a whole. A clear understanding of the direction which federal courts have taken in the development of third-party negligence standards, however, does not require a review of the many reported decisions which have interpreted the 1972 amendments. Rather, a close analysis of specific defects found in certain of the commonly-cited standards will suffice to place the contentions of this Court into perspective and to locate disagreements with past opinions.

### 1. *Business Invitees and Open and Obvious Dangers.*

Most of the post-amendment decisions have understood the House Report to have permitted, suggested, or compelled resort to that portion of tort law which concerns the liability of owners of real property for those injuries sustained by their business invitees. Under this group of cases, discussion of the liability of shipowners to injured longshoremen usually includes some reference to Sections 343 and 343A of the Restatement (Second) of Torts. *See, e.g., Ramirez v. Toko Kaiun, K.K., supra; Frasca v. Prudential-Grace Lines, Inc.,* 394 F.Supp. 1092 (D.Md.1975). Section 343 falls under Title E of the Restatement regarding Special Liability of Possessors of Land to Invitees and states:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger."

The following section, 343A, expands the liability announced in 343 by providing that:

"(1) A possessor of land is not liable to his invitees for physical harm caused to

them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."

A few opinions have stressed the importance of the qualifying language in Section 343A and have characterized their analysis of the liability of shipowners as "modern" while labelling the analysis under Section 343 alone as "traditional." *See Frasca v. Prudential-Grace Lines, Inc., supra,* 394 F.Supp. at 1100–01.

No matter whether courts use Sections 343 and 343A alone or together, the references to rules of real property tort law conflict with the intent of Congress expressed in the House Report. For example, the Restatement sections force courts to define a shipowner's standard of care under the amendments in terms of the plaintiff's perceptions of the danger posed by a given condition. The sections thus tend to foreclose a balanced inquiry into the reasonableness of a vessel's conduct under the circumstances of a particular case and tend to limit the liability of shipowners for their proven negligence. *See, e.g., Anuszewski v. Dynamic Mariners Corp. Panama,* 391 F.Supp. 1143, 1145 (D.Md.1975). The amendments, of course, permit limitations upon a plaintiff's recovery based upon the admiralty doctrine of comparative negligence. However, the amendments specifically reject any bar to recovery based upon contributory negligence and assumption of risk. Yet, the authors of the Restatement clearly indicate that the contributory negligence of the plaintiff and assumption of risk have a direct bearing upon liability under Sections 343 and 343A. Restatement (Second) of Torts § 343, comment d; *id.* § 343A, comment d. The authors also state that whether or not courts conceive of a plaintiff's perceptions of a hazardous condition as relieving a defendant of proven liability or of preventing a finding of liability altogether, the effect of either analysis is the same. *Id.* § 496C; comment d. Defendants receive the benefit of a partial or absolute bar to liability having the characteristics of a defense based upon an implied assumption of risk.

The development of a body of precedent which focuses upon the perceptions of the plaintiff has more than theoretical importance. Reported cases already contain examples of plaintiffs who were not permitted to compare their personal negligence against the negligence of their opponents. *See Anuszewski v. Dynamic Mariners Corp. Panama, supra,* 391 F.Supp. at 1145; *Frasca v. Prudential-Grace Lines, Inc., supra,* 394 F.Supp. at 1101–02. Furthermore, the "shield" afforded by the Restatement sections reduces incentives to remedy dangerous conditions and thus conflicts with the Congressional intent to promote safety in the longshoring industry. House Report, *reprinted in* 3 U.S.Cong. & Adm.News, *supra,* at 4705. Lastly, a search for an appropriate standard of care for shipowners under the amendments among tort concepts which emerged from a common law classification system of diminishing importance makes little practical sense. The Supreme Court has discussed absorption of common law precedent concerning the duties of real property owners toward persons on their land into the law of admiralty and has flatly condemned the effort. *See Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). The *Kermarec* case involved a suit for damages brought by an individual who had fallen on a ship's stairway after a social visit to one of the members of the crew. The Court questioned whether the maritime law recognizes the common law distinctions between invitees and licensees and concluded:

"It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care toward those lawfully aboard the vessel who are not members of the crew. * * * But this Court has never determined whether a different and lower standard of care is demanded if the ship's visitor is a person to whom the label 'licensee' can be attached. The issue must be decided in the performance of the Court's function in declaring the general maritime law, free

from inappropriate common-law concepts. * * *

The distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism. In an effort to do justice in an industrialized urban society, with its complex economic and individual relationships, modern common-law courts have found it necessary to formulate increasingly subtle verbal refinements, to create subclassifications among traditional common-law categories, and to delineate fine gradations in the standards of care which the landowner owes to each. Yet even within a single jurisdiction, the classifications and subclassifications bred by the common law have produced confusion and conflict. As new distinctions have been spawned, older ones have become obscured. Through this semantic morass the common law has moved, unevenly and with hesitation, towards 'imposing on owners and occupiers a single duty of reasonable care in all the circumstances.'

For the admiralty law at this late date to import such conceptual distinctions would be foreign to its traditions of simplicity and practicality. * * * The incorporation of such concepts appears particularly unwarranted when it is remembered that they originated under a legal system in which status depended almost entirely upon the nature of the individual's estate with respect to real property, a legal system in that respect entirely alien to the law of the sea." *Id.* at 630–32, 79 S.Ct. at 409–410 (footnotes and citations omitted).

The Supreme Court's analysis has equal force when applied to attempts to model the standard of care for shipowners under the 1972 amendments to real property tort law principles regarding business invitees and known and obvious dangers. A few courts have recognized the need to shed the more restrictive views of landowners' duties. *See, e.g., Frasca v. Prudential-Grace Lines, Inc., supra,* 394 F.Supp. at 1100. However, excessive reliance upon

property doctrines for guidance in admiralty law complicates the task of satisfying the considerations contained in the House Report and, thereby, frustrates the intent of Congress to develop a body of admiralty negligence law under the 1972 amendments. *See generally The Injured Longshoreman, supra,* 28 Hastings L.J. at 789–90.

### 2. *Independent Contractors and Relinquishment of Control.*

A large number of post-amendment cases have also borrowed from tort law respecting the relationship between contractors and subcontractors. *See, e.g., Cummings v. "Sidarma" Soc.,* 409 F.Supp. 869 (E.D.La. 1976); *Crowshaw v. Koninklijke Nedlloyd, B. V. Rijswijk,* 398 F.Supp. 1224 (D.Ore. 1975); *Fitzgerald v. Compania Naviera La Molinera,* 394 F.Supp. 413 (E.D.La.1975); *Anuszewski v. Dynamic Mariners Corp. Panama, supra.* These decisions have varied the standard of care which shipowners owe to longshoremen depending upon the degree of control which the stevedore maintains over cargo operations. A variable standard of care, in itself, does not conflict with the intent of Congress under the 1972 amendments. Some courts have, therefore, balanced the responsibilities which shipowners and stevedores have toward longshoremen and have held shipowners liable for only those dangerous conditions arising after the start of stevedoring operations of which they have notice. *See Crowshaw v. Koninklijke Nedlloyd, B. V. Rikswijk, supra,* 398 F.Supp. at 1229–30. However, analysis based upon retention or relinquishment of control poses a potential for abuse by courts which view the commencement of cargo operations as extinguishing the liability of vessels for injuries subsequently sustained by longshoremen. *See, e.g., Frasca v. Prudential-Grace Lines, Inc., supra,* 394 F.Supp. at 1101–02 (duration of stevedore's control absolved shipowner of negligence in providing an unsafe place to work). Furthermore, reliance on rules respecting the duties of contractors and subcontractors has the potential of introducing complex common law concepts into admiralty law and

thus invoking the same criticisms raised above in the discussion of invitees on real property. Federal courts should, therefore, avoid reference to principles of control as a substitute for a thorough investigation of the reasonableness of conduct under given circumstances. See generally The Injured Longshoreman, supra, 28 Hastings L.J. at 788–90.

### C. The Proposed Standard of Care.

The Court's proposed standard of care for shipowners under the 1972 amendments derives from close study of the House Report, post-amendment cases, and recent commentary. The standard itself does not reject, but rather subsumes, a great deal of the logic of the post-amendment opinions. For instance, the Court recognizes that shipowners should take reasonable steps to provide a safe place to work, that the obligation to maintain safety may diminish after stevedores commence work, and that vessels should reimburse longshoremen for damages attributable to their personal negligence only. However, the Court rejects resort to terminology which prevents inquiry into the reasonableness of conduct under the circumstances of a given case. Discussions relating to invitees, contractors, primary and secondary responsibilities, obviousness of dangers, and relinquishment of control all have the tendency to steer courts away from a balance of the risk of harm against the utility of the particular conduct in question.

The proposed standard incorporates or permits the free development of the seven considerations discussed earlier which Congress intended as guides for the creation of third-party negligence law. The standard also accords great weight to the language of the Kermarec case which counseled in favor of a balanced analysis of a shipowner's liability to injured nonseamen. The Supreme Court recommended adoption of ordinary negligence principles and stated that "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." Kermarec v. Compagnie Generale Transatlantique, supra, 358 U.S. at 632, 79 S.Ct. at 410.

The proposed standard, however, draws one distinction and contains at least one inference which require comment. The distinction concerns the type of notice which a shipowner must have before and after the commencement of stevedoring operations for a plaintiff to prove negligence. A portion of the House Report quoted above contains the statement that "nothing in [the] bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition." House Report, reprinted in 3 U.S.Cong. & Adm.News, supra, at 4704. This language can be construed to impose liability for constructive knowledge of dangerous conditions which arise during cargo operations. Nonetheless, this Court has concluded, on the basis of the testimony at trial that a ship should remedy only those dangerous conditions arising after the longshoremen start work of which it has actual knowledge. This distinction honors existing practice in the shipping industry and places the burden of safety responsibility during cargo operations upon the stevedoring company which has a greater opportunity to detect dangers in work areas. The proposed standard should not prompt vessel owners to avoid their customary inspections of cargo operations because shipowners have further obligations to their clients and crewmembers concerning the proper loading and discharge of stow. The standard, therefore, reduces the safety responsibilities of shipowners once longshoremen have boarded a vessel but does not permit shipowners to avoid steps to correct hazardous conditions of which they have received actual notice. See generally The Injured Longshoreman, supra, 28 Hastings L.J. at 790–92.

The inference which the proposed standard creates concerns the possible reintroduction of liability without fault into third-party actions under the amendments. The House Report considered the problem and

specifically condemned any theory of recovery based upon the nondelegable duty to provide a seaworthy vessel. A portion of the Report quoted earlier contains the more general statement that:

> "The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness', 'nondelegable duty', or the like." House Report, *reprinted in* 3 U.S.Cong. & Adm. News, *supra*, at 4703.

Nonetheless, the Report just as clearly states that "where a longshoreman or other worker covered under this Act is injured through the fault of the vessel, the vessel should be liable for damages as a third party." House Report, *reprinted in* 3 U.S. Cong. & Adm.News, *supra*, at 4702. A question, therefore, arises regarding the types of conduct which constitute "fault" under the LHWCA. The Act already provides for liability based upon the negligence of a seaman or other agent of the shipowner.[14] Nothing in the legislative history limits the statutory definition of the word "vessel" for the purposes of the third-party action. The Act, therefore, recognizes and the legislative history tacitly acknowledges the applicability of *respondeat superior*, arguably a form of vicarious liability or nondelegable duty, in negligence suits. The resolution of more difficult cases, however, depends upon the Congressional meaning of "nondelegable." One commentator has suggested that Congress used the term in its narrowest sense and did not intend to derogate from the responsibility of the vessel to remedy dangerous conditions of which it has notice. *The Injured Longshoreman,*

*supra,* 28 Hastings L.J. at 795–97. See also, House Report, *reprinted in* 3 U.S.Cong. & Adm.News, *supra,* at 4704. In addition, several post-amendment cases have recognized that Congress could not have intended to abolish all forms of nondelegable duties in third-party actions. *See, e. g., Lucas v. "Brinknes" Schiffahrts Ges. Franz Lange, supra,* 379 F.Supp. at 769 (dictum); *Frasca v. Prudential Grace-Lines, Inc., supra,* 394 F.Supp. at 1098–99. In the *Frasca* opinion, the district court squarely confronted the issue and stated that a shipowner has a duty to exercise reasonable care to provide employees of stevedores with a reasonably safe place to work. *Id.* The court recognized that the duty had "nondelegable" characteristics in the sense that a ship might be liable for the negligence of an agent dispatched to remedy a dangerous condition. However, it stressed that the duty in no sense constitutes the type of liability without fault represented by the doctrine of unseaworthiness. *Id.* In sum, federal courts will have to consider the precise impact of their decisions on a case-by-case basis and should not absolve a shipowner of liability for the personal negligence of its agents on the ground that Congress intended to abolish all forms of nondelegable duty from third-party actions under the amendments. *See generally The Injured Longshoreman, supra,* 28 Hastings L.J. at 795–97.

This Court, therefore, concludes that a plaintiff who brings a negligence action against a shipowner under Section 905(b) of the LHWCA has the burden of satisfying each of the following elements in order to establish liability: (1) a condition existed in an area of the ship in which the plaintiff could reasonably be expected to work which created an unreasonable risk of harm; (2) the defendant had knowledge of the condition (actual or constructive knowledge for conditions arising before the commence-

---

14. The LHWCA states:

"The term 'vessel' means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, *agent,* operator, charter or bare boat charterer, master, officer, or *crew member.*" 33 U.S.C. § 902(21) (emphasis added).

The third-party action may be brought against the "vessel" under 33 U.S.C. § 905(b).

ment of cargo operations; actual knowledge for conditions arising after the commencement of cargo operations); (3) the defendant had a legal ·duty of reasonable care under the circumstances to take reasonable remedial action to prevent the condition from causing harm to a class of persons of which plaintiff was a member; (4) the defendant breached the duty of reasonable care; (5) the plaintiff was injured; (6) the condition actually caused the injury; and (7) the condition proximately caused the injury.[15]

### C. Application of the Proposed Standard to the Case at Bar.

■ An analysis of the findings of fact in the light of the proposed standard of care indicates that the plaintiff has failed to prove the requisite elements of his claim. The record disclosed that Westfal had a practice of taking steps to ensure that unsafe conditions were removed from working areas before the start of any cargo operation in a U.S. port. Westfal also had a practice of assigning a deck officer and at least one seaman not only to see that the stevedore discharged or stowed the appropriate cargo in a proper manner, but also to watch for unsafe working conditions. Nothing in the trial or deposition testimony revealed that Westfal had derogated from

its customary pre-work preparations or work-time inspection. The Court, therefore, concludes that the plaintiff failed to establish that the defendant had actual or constructive knowledge of any form of hazard at the base of the starboard ladder to the fo'c'sle' deck before the commencement of cargo operations on October 25, 1974. The Court further concludes that the defendant lacked actual knowledge of any such hazard at any time after work had begun. The absence of knowledge bars a finding of negligence.

### III., THE 1972 AMENDMENTS AND NEGLIGENCE PER SE

The plaintiff contends that the Court has authority to establish the negligence of the defendant not only on the basis of the so-called "traditional" and "modern" analyses of third-party actions, but also on the basis of the maritime regulations adopted under Sections 6 and 8(g) of OSHA. Act of Dec. 29, 1970, Pub.L. 91–596, 84 Stat. 1593, 1600, 29 U.S.C. §§ 655, 657 (Supp. V, 1975). The plaintiff has not cited, and the Court has not found, a single decision under the 1972 amendments which has applied OSHA regulations against a shipowner. Recent decisions have, in· fact, rejected the type of argument which plaintiff has raised.[16] Nonetheless, the House Report states that:

---

**15.** A recent case from the Court of Appeals for the Third Circuit contains language tending to provide strong support for the proposed standard in this opinion. *Brown v. Ivarans Rederi A/S,* 545 F.2d 854 (3d Cir. 1976). The *Brown* decision (1) cites the *Kermarec* standard with approval, *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); (2) cites sections from the Restatement (Second) of Torts which concern the most general of negligence principles; (3) questions the utility of standards based upon Section 343A of the Restatement due to their incorporation of the defense of assumption of risk; and (4) rejects all forms of vicarious liability.

**16.** As of this writing, four cases involving injuries sustained after 1972 have squarely addressed the issue and each has held the regulations applicable to the stevedore alone. *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233 (5th Cir. 1977); ·*Brown v. Mitsubishi Shintaku Ginko,* 550 F.2d 331 (5th Cir. 1977); *Crowshaw*

*v. Koninklijke Nedlloyd, B.V. Rijswijk,* 398 F.Supp. 1224 (D.Ore.1975); *Hite v. Maritime Overseas Corp.,* 375 F.Supp. 233, 237 (E.D.Tex. 1974).

At trial, plaintiff relied upon two Fifth Circuit opinions that concerned accidents which occurred before the effective date of the 1972 amendments. *Lacaze v. Olendorff,* 526 F.2d 1213 (5th Cir. 1976); *Arthur v. Flota Mercante Gran Centro Americana S. A.* 487 F.2d 561 (5th Cir. ·1974). In the pre-*Lacaze* and pre-*Arthur* case of *Marshall v. Isthmian Lines,* 334 F.2d 131 (5th Cir. 1964), the Fifth Circuit had declined to hold that certain Coast Guard regulations could be used against a shipowner to establish negligence *per se* but left open the question of negligence *per se* in deserving instances. The opinion analyzed the criteria which courts must consider when addressing the issue and stated:

"The law is well established that violation of a statute which is intended to protect the class of persons to which a plaintiff belongs against the risk of the type of harm which

" * * * [N]othing in this bill is intended to relieve any vessels or any other persons from their obligations and duties under the Occupational Safety and Health Act of 1970." House Report, supra, *reprinted* in 3 U.S.Cong. & Adm. News, *supra,* at 4705.

The legislative history of the amendments, therefore, suggests the possibility that Congress intended OSHA regulations to apply to vessel owners. For the reasons stated below, however, the Court declines to adopt plaintiff's theory of negligence *per se* but sanctions use of OSHA regulations in non-jury cases as evidence of desirable safety standards within the shipping industry.

Congress amended Section 41 of the LHWCA in 1958 to permit the promulgation of regulations applicable to all employers under the Act. Act of Aug. 23, 1958, Pub.L. 85–472, 72 Stat. 835, *amending* 33 U.S.C. § 941 (codified at 33 U.S.C. § 941 (1970). The amended language provides that:

"Every employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employments covered by this chapter and shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment and places of employment, and

to prevent injury to his employees." 33 U.S.C. § 941(a) (1970).

Accordingly, the Secretary of Labor promulgated a series of maritime regulations in 1960 which were amended in 1966 and 1969 and incorporated into the body of OSHA regulations pursuant to Sections 6 and 8(g) of OSHA, *supra.*

Despite the various changes to portions of the regulations, however, the introductory sections have remained unaltered since their promulgation in 1960. These passages contain a number of statements bearing upon the applicability of OSHA standards to shipowners. Section 1918.2 states:

"(a) The responsibility for compliance with the regulations of this part is placed upon 'employers' as defined in § 1918.3(c).

"(b) It is not the intent of the regulations of this part to place additional responsibilities or duties on owners, operators, agents or masters of vessels unless such persons are acting as employers, nor is it the intent of these regulations to relieve such owners, operators, agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation or custom."

This language clearly indicates that Congress used the terms "employer" and "vessel owner" to refer to different persons, although a vessel owner could act as an employer in some circumstances. The following section further differentiates between employer and vessel owner by defining an employee as one

" * * * whose employees are employed, in whole or in part, in longshoring

---

has in fact occurred is negligence in itself. * * * Inherent in this statement of the legal principle are three questions which must be resolved before liability could be imposed in this case on a negligence *per se* theory. What proof makes out a violation of the regulations? Were the regulations designed to protect longshoremen? Were they intended to protect against the risk of the kind of harm that occurred here * * *?" *Id.* at 134 (citations omitted).

The *Arthur* opinion simply applied the logic of *Marshall* to third-party actions under the LHWCA and held:

"[T]he purpose of these regulations [is] to promote safety in the industry and establish

an unambiguous standard for measuring industrial safety as it relates to longshoremen, harbor workers or other business invitees that come into contact with a vessel. * * We hold that if the *Marshall* criteria are met, the court may instruct the jury that a violation of the Safety and Health Regulations is negligence per se." *Arthur v. Flota Mercante Gran Centro Americana S. A., supra,* 487 F.2d at 564.

*Lacaze* followed *Arthur* without modification. *Lacaze v. Olendorff, supra,* 526 F.2d at 1220. The more recent Fifth Circuit opinions in *Gay* and *Brown* make no mention of *Marshall, Lacaze,* or *Arthur.*

operations or related employments, as defined herein within the Federal maritime jurisdiction on the navigable waters of the United States." 29 C.F.R. § 1918.-3(c).

The phrase "related employments" means "* * * any employments performed as an incident to or in conjunction with longshoring operations including, but not restricted to, securing cargo, rigging, and employment as a porter, checker, or watchman." 29 C.F.R. § 1918.3(j). In short, Congress promulgated the regulations to apply to employers of longshoremen or to employers of persons engaged in activities incident to longshoring operations such as porters, checkers, and watchmen. The list of related employments is not restrictive, but a concurrent reading of Sections 1918.2 and 1918.3 dispels any contention that shipowners and stevedores are synonymous for the purposes of holding each to the standards of safety found in the maritime regulations.

Nothing in the above-quoted portion of the House Report, regarding the intent of Congress to maintain existing obligations of vessels under OSHA, conflicts with the interpretation of the regulations as primarily applicable to stevedores. The Congressional language simply mirrors OSHA Section 1918.2 which states that the regulations were not intended to enlarge or diminish the responsibilities of vessel owners as regards maritime safety. The only obligations to which Congress could have referred in the House Report, therefore, are those which arise when vessel owners act as employers within the meaning of OSHA.

■ In the alternative, the plaintiff asserts that, if the 1972 amendments do not permit use of the OSHA regulations to establish the negligence *per se* of the shipowner, the regulations should be used as a guide to determine the standard of care which a vessel owner owes to a longshoreman for the purposes of establishing common law negligence. The argument, however, merely changes the emphasis which a court would give to the regulations and does not resolve the defects noted in the

discussion of negligence *per se*. This Court, therefore, concludes that the OSHA regulations are admissible in nonjury cases against shipowners under the 1972 amendments only to indicate the safety standards which other maritime employers (here, stevedores) owe to their employees.

## IV. MOTION TO STRIKE

At the close of trial, the plaintiff moved to strike all testimony and exhibits pertaining to duties which a stevedore owes to its employees. The plaintiff asserted that such evidence was irrelevant to a discussion of the duties of shipowners to longshoremen and that recent Ninth Circuit opinions had established that the concurrent negligence of a stevedore does not defeat or reduce recovery against a ship under the amendments. *See, e. g., Dodge v. Mitsui Shintaku Ginko K. K. Tokyo,* 528 F.2d 669 (9th Cir. 1975); *Shellman v. United States Lines, Inc.,* 528 F.2d 675 (9th Cir. 1975). After consideration of the oral arguments and relevant case law, the Court denies the motion.

■ The plaintiff accurately stated the rule in this Circuit that a stevedore, though negligent, may seek reimbursement of benefits paid under the LHWCA by enforcing a lien against a judgment in favor of an injured party, *Dodge v. Mitsui Shintaku Ginko K. K. Tokyo, supra,* 528 F.2d at 674, *Shellman v. United States Lines, Inc., supra,* 528 F.2d at 679–80, but that the injured party may recover full damages against the concurrently negligent shipowner. *Dodge v. Mitsui Shintaku Ginko K. K. Tokyo, supra,* 528 F.2d at 674, *Shellman v. United States Lines, Inc., supra,* 528 F.2d at 680. Furthermore, the plaintiff emphasized that the primary issue in this case concerns the standard of care which shipowners owe to longshoremen engaged in cargo operations not the standard of care which stevedores owe to their employees. Nonetheless, plaintiff's arguments do not support a motion to strike under the particular circumstances of this suit.

Insofar as plaintiff's motion speaks to written testimony, the Court has already indicated that the maritime regulations adopted under OSHA may be admissible in nonjury trials to exemplify the types of safety responsibilities which one kind of employer in the shipping industry (*i. e.*, a stevedore) owes to its employees. Plaintiff has also asked the Court to admit the regulations to establish the negligence *per se* of Westfal. The motion to strike, therefore, indicates that the plaintiff wished the Court to use the regulations directly against the shipowner or to exclude them altogether. The circumstances of this case do not justify such extreme measures. In the context of a court trial, admission of the OSHA regulations does not prejudice the arguments of either party. This Court has not used the regulations to establish the negligence of Crescent nor has it used the regulations to determine that only stevedores have safety responsibilities pertaining to slippery conditions on walking surfaces. The proposed standard reveals that shipowners and stevedores have a great many overlapping duties of care toward longshoremen. The Court simply concludes that OSHA regulations designed for employers of longshoremen may not be introduced as direct evidence of the standard of care which shipowners owe to longshoremen.

Similarly, plaintiff's arguments do not support a motion to strike all oral evidence of the duties of stevedores to their employees. Verbal as well as exhibit testimony provides direct information of safety customs and practices in the shipping industry and, as mentioned above, helps to define the types of duties which Congress has imposed on some maritime employers. In short, the Court does not decide the merits of plaintiff's motion for all possible third-party actions under the amendments, but concludes that the oral and exhibit testimony regarding the safety obligations of stevedores to longshoremen are sufficiently relevant and material in this suit to justify their admission.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Defendant shall prepare and lodge with the Court a form of judgment, approved by plaintiff on or before June 16, 1977.