**Melvin DARWIN, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. C–75–1692 WHO.**

United States District Court, N. D. California.

June 7, 1977.

502

Barrett R. Baskin, San Francisco, Cal., for plaintiff.

James L. Browning, Jr., U. S. Atty., Paul G. Sterling, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## OPINION

ORRICK, District Judge.

Plaintiff, a longshoreman employed by the California Stevedore and Ballast Com-

pany, slipped and fell, injuring his wrist, back, neck, and head, while walking down a steel ramp between the lower tween deck [1] and the lower hold of the USNS Sealift. He brings this action under the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, and the Public Vessels Act, 46 U.S.C. §§ 781–790, alleging that his injuries were proximately caused by the defendant, United States', negligent maintenance, operation, control, and supervision of the vessel, specifying the inadequacy of the lighting on the ramp and the slipperiness of the ramp's surface.

For the reasons hereinafter stated, the Court holds the defendant shipowner, United States, liable for plaintiff's injuries. This opinion constitutes findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.

### I.

The USNS Sealift (now USNS Meteor) is a merchant-type "roll on-roll off" ship— that is, it is equipped with ramps on which vehicles can be rolled and driven, as well as hatches for stowing general cargo. The Sealift's ramps are composed of two different metal surfaces. The outer edges and the center segments are made of smooth metal, while the remaining portions (two *broad* strips) are metal grid. To reduce the likelihood of skidding, metal in the grid is turned at an angle so that a tire or shoe makes contact only with the edges of the grid. The nonskid qualities of the metal are further enhanced by the fact that oil and small debris run through the grid openings rather than accumulating on the surface. It is only when debris is allowed to gather and the openings become clogged that oil can build up. Hosing and periodic steam cleaning are necessary to avoid clog-

ging. Of course, even when the grid is properly cleaned, the grid edges themselves are somewhat more slippery if they become coated with oil or, especially, with a combination of oil and water.

The ramp on which plaintiff fell extends from the lower tween deck to the lower hold of the vessel and is approximately 57 to 60 feet long. The ramp is illuminated by fluorescent tube lights attached overhead and spaced 20 to 25 feet apart. The vessel also carries portable "cluster" lights.[2]

On the day of the accident, the Sealift was moored at Pier 7 West, Oakland Army Base, Oakland, California. Plaintiff had begun his work on the vessel during the weekend preceding the accident, at the beginning of the shift. On Monday, it rained for at least part of the day. The longshoremen were divided into two gangs. One gang spent the day discharging the heavier vehicles while the other, plaintiff's gang, first discharged lighter material and then began loading trailers. Some of the heavy machinery had been stowed on the ramp on which plaintiff later fell, and members of the other gang had worked there on the day of the fall, but plaintiff himself had never walked on the ramp prior to his accident.

Tommy Patterson, a member of the gang working the heavy machinery, had been on the ramp and had noticed that some of the machinery was dripping oil. He had noticed as well that the ramp was slick from oil and water, but testified that he had not reported the condition or sought sawdust to alleviate it [3] because he thought that there would be no further work on the ramp that day. Indeed, at the time of plaintiff's accident, all vehicles had been gone from the ramp for two to three hours. Captain Landry, who was master of the vessel at the

---

**1.** The Sealift has four levels: the main deck, the upper tween deck, the lower tween deck, and the hold.

**2.** Emergency incandescent lights past the foot of the ramp are not normally used. Additional lighting is located approximately 15 feet from the bottom of the ramp.

**3.** It is not entirely clear that sawdust would have helped the condition on the ramp. Since the metal grid was designed to let debris flow through and away, the sawdust might have done more harm than good by clogging the openings and allowing debris to build up. Captain Landry, in fact, mentioned that use of sawdust on the ramp would tend to fill the smaller areas and "reduce its effectiveness." Landry deposition at 34.

time of the accident, did not know precisely when the ramp had last been pressure hosed or steam cleaned.

Patterson testified in addition that the lighting on the ramp was dim, and that the illumination decreased from the part of the ramp closest to the lower tween deck to the part closest to the lower hold.[4] While, as stated above, the ceiling over the ramp is equipped with fluorescent lights, no evidence of the wattage of these lights was presented at trial, nor was it known whether all the lights were operative on the day of the accident. The naval architect who had designed the vessel testified that the level of illumination compared favorably with that on standard cargo vessels, and was adequate for cargo handling and safe passage up and down the ramp, but he had not inspected the finished lighting before the accident. In addition, although cluster lights were available, and were used to illuminate the *hold,* the longshoremen questioned at trial had never seen them used on the *ramp.*

During the time that Patterson's gang had been working on the ramp, the lower tween deck hatch cover had been open, letting in some natural light. At the time of the accident, however, work in the lower hold had been completed and the forward lower tween hatch cover had been closed. No lights were attached to the hatch cover to compensate for the loss of natural light. Thus, the dimness which Patterson had noticed was aggravated by the lack of natural light when plaintiff descended the ramp.

Directly before the accident, plaintiff and his co-worker, Eric Malveaux, had been working on the lower tween deck loading trailers. While the men had noticed no oil on the lower tween deck, the rain that day had made the deck wet.

At approximately 4:15 p. m., the gang boss ordered plaintiff and Malveaux to get some dunnage,[5] pointing down the ramp toward the lower hold where it was common to leave dunnage. As mentioned above, all work in the lower hold had ceased by this time and the forward hatch cover had been closed. Plaintiff and Malveaux accordingly started down the ramp with plaintiff leading the way.[6] As noted above, plaintiff had not been down the ramp previously (nor had Malveaux). The lighting became increasingly dim in the course of the descent. Plaintiff was walking on the grid (nonskid) surface at an ordinary gait. Approximately 10 feet from the bottom of the ramp he slipped and fell. He landed mainly on his left wrist as he thrust his arm out to try to break his fall; he injured his head, back, and neck as well.

While plaintiff had noticed no oil on his shoes before the fall, both his shoes and his clothing had oil on them immediately thereafter. Plaintiff's companion noted that there was a puddle of oil on the ramp as well, mostly on top of the grid.

Plaintiff's "walking boss" at the time of the accident, Roy Ireland, made out an accident report stating that plaintiff had slipped on an "oily plank" and injured himself. Ireland had not seen the accident. He had heard no complaints about the lighting on the day of the accident, though equipment failures were normally called to

---

**4.** The decrease in illumination was attributable to a combination of the increasing distance from the natural light and the fact that the fluorescent lights were closer to the ramp at the top of the ramp than at the bottom. *See Id.* at 42.

**5.** "Dunnage" as used here refers to one-inch boards used to cushion steel cargo as it is being moved aboard the ship.

**6.** The ramp was the only feasible means of passage from the lower tween deck to the lower hold. Plaintiff testified that there was a ladder between the two levels, but that cargo blocked access to it. In addition, Captain Landry noted that the vessel has a "personnel elevator" on the port side, aft port which "[t]o the best of his recollection" was "operational to the lower hold." Landry deposition at 14. *Plaintiff testified that he did not know that the elevator went to the lower hold and that he thought it was used exclusively by the ship's crew.* Captain Landry also noted that the ramp surface was customarily used by ship's personnel and others "as being the most expedient." *Id.* at 13.

his attention by the "gang bosses"[7] or stevedores. Ireland had not walked on the ramp below the first tween deck prior to the accident. After plaintiff's report, Ireland looked down the ramp for the "oily plank," but he saw no dunnage on the ramp and never went down the ramp. He did remark that there was a film of oil on the ramp, adding that there was no way for oil to accumulate there. Ireland did not remember talking to others about the accident.

Following the accident, plaintiff first consulted his regular physician, Dr. Duterte, who diagnosed a severe sprain to his left wrist and a sprain to the cervical and lumbar regions. His left arm was placed in a cast for approximately one month, and he was given a cervical collar and heat treatments. He received therapy after his cast was removed, and the therapy continued after he returned to work.

When the wrist did not improve, plaintiff was treated further by a Dr. Giovannini, who diagnosed chondro-calcinosis, chiefly on the basis of x-rays showing calcification adjacent to the left navicular bone. Dr. Giovannini injected plaintiff's wrist with steroids, which produced significant relief, and allowed plaintiff to return to work. His wrist has achieved a pre-injury state. While the condition could possibly return after trauma or vigorous activity, the likelihood of future wrist problems is speculative and remote.[8]

■ Plaintiff also complained of constant back pain and some head pain, and he is currently taking pain medication. The back injury, however, cannot be attributed to the original accident, since plaintiff injured his back in a subsequent accident as well, and insufficient evidence was presented to link the present pain with the original injury.

7. As to the failure to report lighting deficiencies, see note 14 *infra*.

8. Plaintiff did complain of some present pain in his wrist when he grips or moves his wrist quickly, but his major complaints did not concern his wrist at all.

9. Plaintiff testified that he had two jobs. He worked for an elevator company, but when he

Plaintiff was unable to work between March 25 and June 30, 1975. His average salary as of March 24, 1975, was $310.35 per week.[9] Thus, his wage loss resulting from the accident totals $4,345. His medical care and treatment amount to $1,005.

Plaintiff's employer at the time of the accident, California Stevedore and Ballast Company, is self-insured with reference to workers' compensation payments and has extended a total of $2,896.55 in temporary disability compensation and $1,005 in medical expenses. Thus, the total lien of the employer is $3,901.55.

## II.

■ At the outset, the Court is met with plaintiff's contention that violation of certain sections of the Safety and Health Regulations for Longshoring, 29 C.F.R. § 1918 *et seq.*, establishes the shipowner's negligence *per se*. Irrespective of the validity of this proposition as applied to *private* shipowners,[10] it must fail when, as here, the vessel is owned by the United States. This conclusion is mandated by provisions of the Longshoremen's and Harbor Workers' Compensation Act (hereinafter cited as LHWCA), 33 U.S.C. § 901 *et seq.*, by the regulations promulgated thereunder (now 29 C.F.R. § 1918 *et seq.*), and by the Occupational Safety and Health Act of 1970 (hereinafter cited as OSHA), 29 U.S.C. § 651 *et seq.*, which incorporated the LHWCA regulations.

The clearest statement in this regard is contained in OSHA Section 652(5), which provides:

"The term 'employer' means a person engaged in a business affecting com-

was laid off from that job, as he was at the time of the accident here, he did longshoring work.

10. For an extensive treatment of this question, see this Court's decision in *Gallardo v. Westfal-Larsen & Co. A/S*, 435 F.Supp. 484 (N.D.Cal. 1977).

merce who has employees, *but does not include the United States or any State or political subdivision of a State.*" (Emphasis added.)

The plaintiff contends that this exclusion does not preclude application of the Longshoring regulations because these regulations were developed to implement the LHWCA, *not* OSHA. Indeed, the regulations were promulgated pursuant to legislation amending Section 941 of the LHWCA. Act of Aug. 23, 1958, Pub.L. 85–742, § 1, 72 Stat. 835, well before the passage of OSHA.[11]

■■■ Nevertheless, even if the OSHA exclusion does not definitely prevent application of the regulations to the United States, the LHWCA and the regulations themselves indicate that exclusion is proper. 33 U.S.C. § 902(4) (part of the LHWCA) defines "employer" broadly as

"* * * an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)." As amended Oct. 27, 1972, Pub.L. 92–576 § 2(b).

The definition of "employee," however, specifically excludes "a master or member of a crew of any vessel * * *." 33 U.S.C. § 902(3), as amended Oct. 27, 1972, Pub.L. 92–576 § 2(a). In addition, the "coverage" section of the LHWCA, 33 U.S.C. § 903, specifies that:

"(a) * * * No compensation shall be payable in respect of the disability or death of—

* * * * * *

(2) An officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof." As amended Oct. 27, 1972, Pub.L. 92–576, § 2(c).

These two sections strongly suggest that the United States is not intended to pay compensation under the LHWCA. The regulations, however, are designed to govern the activities of those who are liable for compensation or, at the very most, of private employers in general. Both of these conclusions are directly reinforced by the "purpose and authority" section of the regulations, 29 C.F.R. § 1918.1, which provides in subdivision (a):

"(a) The Longshoremen's and Harbor Workers' Compensation Act (44 Stat. 1424; 33 U.S.C. 901 et seq.) provides compensation for injuries suffered by employees when they are working for *private employers* within the Federal maritime jurisdiction on the navigable waters of the United States, including dry docks. Public Law 85–742, 72 Stat. 835, approved August 23, 1958, which amends section 41 of the Longshoremen's and Harbor Workers' Compensation Act, as amended (44 Stat. 1444; 33 U.S.C. 941) requires, among other things, that *every employer of the aforementioned employees* 'shall install, furnish, maintain, and use such devises and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment and places of employment, and to prevent injury to his employees.' *It is the purpose of the regulations of this part to carry*

---

11. This chronology might be said to support a view contrary to plaintiff's. Since the regulations *did* become a part of OSHA, the more recent OSHA definition of "employer" could be construed to be the "last word" on the subject of coverage. On the other hand, the inaccuracy of such a conclusion is suggested by 29 U.S.C. § 653(b)(4), which provides that:

"Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment."

*out the intent of Public Law 85–742.''* (Emphasis added.)

The regulations are not intended to protect stevedores on United States ships from the actions of United States shipowners. *Cf. Arthur v. Flota Mercante Gran Centro Americana, S.A.*, 487 F.2d 561, 563–64 (5th Cir. 1973).[12]

### III.

Having determined that violation of an OSHA regulation cannot establish the United States' negligence *per se* here, the Court must consider whether *under the circumstances* the shipowner was negligent.

In *Ramirez v. Toko Kaiun K.K.*, 385 F.Supp. 644 (N.D.Cal.1974), this Court determined that the standard of care owed by a shipowner to the longshoremen working the vessel's cargo requires that the owner

" * * * (1) exercise ordinary care to place the ship and equipment in such condition that an experienced stevedore will be able, when exercising ordinary care, to discharge the cargo in a workmanlike manner and with reasonable safety to persons and property, and (2) give the stevedore warning of any concealed or latent defects that are known by the shipowner." *Id.* at 646.

■ In *Gallardo v. Westfal-Larsen & Co. A/S*, 435 F.Supp. 484 (N.D.Cal.1977), a companion decision rendered shortly before the present opinion, this Court adopts an expanded version of the *Ramirez* standard which more accurately applies traditional negligence principles in deciding the scope of the shipowner's duty. According to the *Gallardo* standard:

"Before the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual or constructive knowledge. After the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual knowledge." *Id.* at 490.

■ The *Ramirez* standard is addressed to certain types of negligent behavior. It describes the most *obvious* situations in which a shipowner is negligent, since both prongs focus on the condition of the ship itself. There is little dispute that a shipowner should be held liable for failure to exercise ordinary care to place his property in safe condition or warn of known deficiencies in it. A shipowner who did not meet the *Ramirez* standard of care would, therefore, always be negligent under the *Gallardo* standard. In *Gallardo*, however, this Court holds that a shipowner may be liable not only when he fails to place his ship in adequate condition or warn of known latent defects, but more generally *whenever* he fails to exercise due care under the particular circumstances. Under the *Gallardo* standard, therefore, a ship-

**12.** The fact that the regulations cannot be applied to United States shipowners to establish negligence *per se*, however, does not render them wholly void of evidentiary value. While *only* private employers are responsible for compliance with the regulations, the provisions by no means demand that only such persons are responsible for maintaining safe working conditions. Under certain circumstances, pursuant to recognized principles of negligence, the shipowner will be at least similarly responsible. To the extent that the shipowner shares responsibility, the regulations may prove helpful in suggesting the *types* of measures deemed necessary for the maintenance of a safe ship.

In the present case, the defendant objected to the plaintiff's Exhibit 16, copies of 29 C.F.R. §§ 1918.91(c) and 1918.92(a). The former provides that "[s]lippery conditions shall be eliminated as they occur." The latter specifies that "[a]ll walking and working areas shall be adequately illuminated." Under the circumstances presented in the present case, as explained *infra*, the shipowner had a duty to provide and maintain safe working conditions in the areas to which the regulations refer, and the exhibit was properly admissible to indicate generally the *types* of safety measures appropriate to the shipping industry. Moreover, while the regulations may be of limited evidentiary value, this value in the present case outweighs their prejudicial value. *See* Fed.R.Evid. § 403. A contrary result would be more likely in the case of a jury trial, at least in the absence of a detailed limiting instruction regarding the use of the regulations.

owner might be found liable for failure to remedy or warn of an unreasonably dangerous condition on board the ship even though the ship itself and its own equipment were in adequate condition.

As demonstrated below, the defendant in the present case is liable *even* under the *Ramirez* standard. The *Ramirez* analysis is offered along with the more general negligence analysis for the purpose of illustrating the similarities and differences between the two approaches.

### A.

■ Under the first prong of the *Ramirez* standard, the shipowner in the present case had a duty to provide illumination on the ramp which would allow longshoremen to use it with reasonable safety. As Captain Landry noted, the ramp was the most common means of passage from one level to another. Landry deposition at 13. Thus, it should reasonably have been anticipated that the ramp would be used whenever a crew member or longshoreman had reason to descend from the lower tween deck to the lower hold. Such occasions should reasonably have been anticipated to include instances in which, as in the present case, one or more hatch covers were in place, excluding natural light.[13] While cluster lights were apparently available, the longshoremen had never seen them used on the ramp. Moreover, no lighting is attached to the hatch covers to compensate for the lack of natural light. Finally, there is no evidence as to the wattage of the lights or whether all were operative either on the day of the accident or when stevedoring operations began. Therefore, the adequacy or not of the lights *as planned* is largely irrelevant. The testimony overwhelmingly established that *in fact* on the descent in question it was inadequate.[14] In sum, the preponderance of the evidence established that the shipowner failed to exercise ordinary care to place the vessel in adequate condition by providing sufficient illumination on the ramp.

Naturally, since a shipowner has a duty to place the ship in adequate condition (*i. e.*, a duty to "take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual [or constructive] knowledge", *Gallardo v. Westfal-Larsen & Co. A/S, supra*, at 490, and since the shipowner here failed to exercise ordinary care to do so, the shipowner would be negligent under the *Gallardo* standard as well. As suggested above, the same result is reached under each standard because the *type* of deficiency was one in the standard equipment of the ship, a deficiency for which the shipowner is most obviously responsible. The point of departure from *Ramirez* is in the *Gallardo* proposition that the shipowner can be found negligent in a variety of *additional* circumstances.

### B.

As to the slickness of the ramp there is substantially more question whether the shipowner breached a duty owed under *Ramirez*. When the *Gallardo* analysis is undertaken, questions are also presented, some of them the same and some considerably different.

The shipowner had equipped the vessel with the grid-like ramp for the *specific purpose* of improving traction of machines and people. There was no persuasive evidence of any superior alternative safety

---

13. Even when natural light had been available, during the earlier work on the ramp, the lighting had gotten dimmer and dimmer as the ramp approached the lower hold. As explained in note 4, *supra*, this increasing dimness was attributable partly to the distance from the natural light and partly to the fact that there was less distance between the fluorescent lights and the ramp surface at the top of the ramp than at the bottom.

14. The fact that no lighting problems had been reported to the walking boss prior to the accident cannot be deemed to establish the sufficiency of the lighting. The lighting conditions on plaintiff's descent were simply not the same as those experienced by the longshoremen who had worked the hold earlier, owing to the unavailability of natural light after the hatches were covered.

device.[15] Nevertheless, while Captain Landry indicated that the ramps were customarily hosed or steam cleaned to prevent accumulation of dangerous quantities of oil, there was no evidence as to when the ramp had last been cleaned. Captain Landry did testify that the hosing occurred once a month with the type of cargo involved here (Landry deposition at 57) and that steam cleaning occurred approximately once a year if necessary. If undue accumulation was allowed, the shipowner violated the first prong of *Ramirez* by failing to place the ramp in proper condition for the longshoremen's work.

Under the *Gallardo* standard, the analysis regarding the ramp itself and whether it had been properly maintained is precisely the same. If an unduly long period had elapsed since the last grid cleaning, the shipowner would be negligent for failure to take reasonable remedial action. Such negligence would be based *both* on the vessel's actual *or constructive* knowledge of the condition before stevedoring operations had commenced *and* on the vessel's *actual* knowledge of the condition *during* operations, as Captain Landry testified that inspections by the vessel during operations included examination of the ramps where longshoremen were working.

Some of the differences between the *Ramirez* standard and the standard announced in *Gallardo* do emerge, however, upon consideration of the shipowner's inspection of the ramp and the duty to remove or warn of the presence of oil which had appeared as a result of the stevedoring operations. Questions regarding inspection and warning invoke the *second* prong of *Ramirez*, which imposes a duty to warn only if the defect is concealed or latent and only if it is known by the shipowner. Captain Landry testified that according to logbook entries, a crew member was probably present in the *area* of the ramp approximately one-half hour before the accident (at the time that the hatch was being closed). Landry deposition at 46.

He also testified that the ship's officers inspected the ramps during stevedoring operations when making their rounds. *Id.* at 46. Testimony did *not* establish, however, when the ramp was actually inspected by a ship's officer or whether any such inspection would have preceded or followed the hatch closing.

Under *Ramirez*, recovery based on failure to warn would likely fail. First, while not stated directly, the *Ramirez* standard envisions a situation in which the shipowner prepares his ship for the stevedoring operations and then lets the stevedore take over. Oil arising, as it did here, during stevedoring operations *could*, through a broad reading of *Ramirez*, be called a "defect," but it is not the type of condition contemplated by the *Ramirez* standard.

Second, assuming that there was an actual ramp inspection by a ship's officer or crew member prior to the accident, if the hatch had been closed at the time of inspection, the inadequate lighting would presumably have prevented discovery of the oil. If, on the other hand, the officer or crew member saw the oil before the hatch was covered, and if there was an amount of oil sufficient to make the ramp dangerous, it *could be argued* that the shipowner violated the second prong of *Ramirez* since the condition which was *obvious* when the covers were open should have been foreseen as *becoming latent* when the illumination was reduced, thereby invoking the duty to warn the longshoremen. To find negligence, however, the Court would be required to strain *Ramirez* by deeming the oil a defect and further by determining that an obvious defect invokes the duty to warn if it will foreseeably become latent.

■ Under the *Gallardo* standard, although recovery for failure to warn is *also* doubtful, the inquiry is considerably less artificial. The *Gallardo* standard does *not* assume that the shipowner merely prepares the vessel and then eschews all involvement; nor does the new standard make any

---

**15.** For example, railings running down the side of the ramp would encourage people to walk on the unsafe *smooth* metal portion of the ramp adjacent to the sides. Moreover, railings could hinder the cargo-moving operations for which the ramps were primarily designed.

assumptions to the contrary. Rather, the court is directed to examine the circumstances to see what involvement the shipowner undertook and whether the shipowner failed to exercise due care under the circumstances. Thus, there is no definitional problem regarding whether oil arising during the cargo operations can be called a "defect." Moreover, under *Gallardo*, the fact that a condition is "obvious" rather than latent does not preclude a finding of shipowner liability, so long as the condition is unreasonably dangerous and, if it arises during stevedoring operations, so long as the shipowner has actual knowledge of the condition.[16]

The elimination of these rather artificial barriers, however, does not necessarily lead to recovery for failure to warn of the oil. As stated above, the actual circumstances must be examined. Because the evidence established that the oil arose at least in substantial part during cargo operations, the shipowner under *Gallardo* would have a duty to take reasonable remedial action *only* if the ship's officer actually learned of the dangerous condition. In the present case, Captain Landry's testimony did establish that the shipowner's crew did *not* simply abdicate control during stevedoring operations; instead, the crew shared at least some involvement. For example, Captain Landry stated:

> "The watch officer has the responsibility of overseeing the operations that are being conducted at the time that he is on watch. He has the responsibility for noting and correcting or taking action to correct any conditions that require corrective action as such. If it is beyond his ability to correct it, he will call the matter to the attention of the walking boss or the superintendent to have the matter corrected if a condition exists that requires corrective action." Landry deposition at 30.

Captain Landry further described the duties of the ship's officer on his rounds as "[o]ne, to see that the cargo is either being discharged or loaded in the proper manner, that the ship's gear is being utilized properly, that unsafe conditions are corrected or any other condition that requires necessary action to conduct safe operations." *Id.* at 31.

 Moreover, as stated above, the ship's officers did inspect the ramps on their rounds. As discussed in the *Ramirez* analysis, however, Captain Landry could not state when the ramp was last inspected before the accident. He concluded only that a ship's crew member was probably in the area around one-half hour before the accident, while the hatch cover was being closed.[17] *Id.* at 46. Again, if the ramp was inspected *before* the cover was closed, the accumulation of oil would have been visible. In such a case, if the ship's officer did in fact learn of the oil, he should have warned of the condition or taken steps to alleviate it, as it was foreseeable that someone would use the ramp even though cargo operations had ceased. If, however, the ramp was inspected *after* the closing, the inadequate lighting would have obscured the condition and inspection would probably not have revealed the condition. In addition, it is reasonable to conclude that the ramp would not have been inspected at all if crew members were present only to negotiate the closing of the hatch cover. Thus, under the circumstances, it is doubtful that the crew was negligent in failing to report or correct the dangerous condition. In fact, the most reasonable conclusion is that the condition was never actually observed by a crew member. Therefore, since the condition arose during cargo operations, there was no duty on the shipowner's part under the *Gallardo* standard to warn of the danger or to remedy it.

---

16. This finding is compatible with the longstanding notion that assumption of the risk is not available as a defense in maritime law which relies instead on the rule of comparative negligence. *See, e. g., Socony-Vacuum Co. v. Smith*, 305 U.S. 424, 432, 59 S.Ct. 262, 83 L.Ed. 265 (1939).

17. Captain Landry noted in fact that sometimes two or even three officers oversee cargo operations. Landry deposition at 54–55.

**512**

### C.

In any event, in view of the fact that the inadequacy of lighting clearly establishes both a *Ramirez* violation and failure to observe the standard of care articulated in *Gallardo*, it is unnecessary to determine whether or not the ramp condition constitutes a second instance of negligence.[18]

Once the breach of the duty owed under *Gallardo* is established, the Court must determine whether such breach is the actual and proximate cause of the accident. Here, the inadequacy of the lighting prevented plaintiff from discovering the oil on the ramp. Testimony revealed that a substantial amount of oil covered the portion of the grid on which plaintiff fell. Plaintiff's companion, Malveaux, noted a "puddle" of oil on the grid, and plaintiff's clothing and shoes acquired a considerable amount of oil in the accident. Presumably, then, adequate lighting would have enabled plaintiff to spot the dangerous condition. Moreover, the lack of illumination was a proximate cause of the accident. It is foreseeable that inadequate lighting on the ramp will obscure dangerous accumulations of slippery substances, and it is foreseeable that one who is unable to see such substances might slip on them and fall, injuring himself. Thus, both actual and proximate causation are established.

### IV.

This Court further concludes that plaintiff was not negligent under the circumstances. The evidence, documentary and testimonial, established that he was walking on the grid (nonskid) surface at the time of his fall and that he was walking at a normal gait. The fact that he was not walking slower than normal is insufficient for a finding of negligence, in view of the

fact that he was walking on the grid surface and the fact that some light (albeit inadequate to reveal dangerous substances) was available. Finally, there was insufficient evidence to establish that he was not looking where he was going.

### V.

In determining the amount of damages, the Court is guided by the recent opinion of the Court of Appeals for this Circuit in *Shellman v. United States Lines, Inc.*, 528 F.2d 675 (9th Cir. 1975), *cert. denied* 425 U.S. 936, 96 S.Ct. 1668, 48 L.Ed.2d 177 (1976). In *Shellman*, the court made it clear that the plaintiff is entitled to recover his full amount of damages from the shipowner regardless of the concurring negligence of the stevedore employer and the shipowner. *Id.* at 681. Therefore, having found the shipowner negligent, this Court need not determine the negligence, if any, of the stevedore employer.[19]

Plaintiff's total lost wages amount to $4,345. His medical care and treatment have cost $1,005. In addition to wage loss and medical expenses, plaintiff claims damages for past and future pain and suffering, asserting that he permanently injured his head, neck, back, and left arm and wrist. The Court finds that he is entitled to an award of $5,000 for past pain and suffering; however, there is insufficient evidence of continuing pain or suffering attributable to the original injury. Therefore, the prayer for damages for future pain and suffering is denied. Plaintiff's damages thus total $10,350.

Since plaintiff is not himself negligent, he is entitled to recover this entire amount.[20] He is entitled to a judgment and

---

18. A decision *would be* required if the plaintiff were shown to have been negligent, for purposes of calculating percentages of negligence. Since the plaintiff here was not negligent (*see* part IV *infra*), such determination is unnecessary.

19. Of course, the plaintiff's own negligence would reduce his recovery, but none is found here.

20. The stevedore employer has paid the medical expenses ($1,005) as well as $2,896.55 in temporary disability compensation. Therefore, it is entitled to recover its full lien of $3,901.55. See *Shellman v. United States Lines, Inc.*, 528 F.2d 675, 678–679 n. 2 (9th Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1668, 48 L.Ed.2d 177 (1976).

final decree for damages for personal injuries in his favor and against the defendant, United States of America, in the sum of ten thousand three hundred fifty dollars ($10,350), costs of suit, and interest on said judgment at the rate of seven percent (7%) per annum from the date of entry of judgment herein until paid.

Plaintiff will prepare and lodge with the Court a judgment, approved as to form by defendant, on or before June 21, 1977.