Carlos **ESPINOZA**, Plaintiff,

v.

**UNITED STATES LINES, INC.,**
Defendant.

No. 76 Civ. 3720(GLG).

United States District Court,
S. D. New York.

Jan. 6, 1978.

Semel, Patrusky & Buchsbaum, New York City, for plaintiff, by Alan H. Buchsbaum, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant, by Robert P. Hart, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

This is a negligence action under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–50 (1970 & Supp. V 1975), for injuries sustained by the plaintiff while he was working aboard the defendant's vessel, the American Accord. After the trial, the jury returned a verdict for plaintiff of $90,000. The defendant timely moved for a directed verdict and judgment notwithstanding the verdict, and the Court reserved decision. After reviewing the evidence presented and the growing amount of applicable case law, the Court grants defendant's motion.

### I.

Typical of this area of federal maritime law, the plaintiff's simple story gives rise to several somewhat troublesome legal issues.[1] Plaintiff was employed by A. G. Shipping Maintenance Corp. as a lasher. A. G. Shipping was employed to aid in the loading of containers aboard the defendant's container ship, the American Accord, at a pier in Port Elizabeth, New Jersey. As a lasher, the plaintiff's job was to climb on top of the containers as they were hoisted aboard the ship's deck in order to secure the containers to the deck and to each other with steel cables.

On the night that the plaintiff was injured, he was working on top of a stack of four such containers. While assisting in securing cables to the top container in the stack, he slipped and fell off the stack onto an adjacent stack eight feet below, which was three containers high. Although there were some differences in the testimony concerning the nature and extent of plaintiff's injuries, it was established that he did suffer a degree of disability.

The cause of the plaintiff's fall was not clear from the evidence. At an earlier deposition, he gave several explanations, including the possibility that there was an improper patch on the top of the container from which he fell. At trial, however, he claimed that the container top had a "canal" or dent in it near the edge, which caused him to slide off onto the stack below.[2] The defendant contended that it was raining and the plaintiff merely slipped on the wet surface.

The theory of the plaintiff's case was that the shipowner was negligent in not having an officer on the bridge to inspect the containers as they were lifted aboard by the stevedores. Conflicting expert testimony was presented on whether such inspection procedures were customary for a ship's crew to undertake. There was no evidence that such inspection was carried out by any member of the ship's personnel in this particular case.

---

1. Chief Judge Kaufman has aptly compared modern legal attempts to deal with the injured longshoreman to "ancient mariners who puzzled over the Greek god Triton and the mermaids." *Munoz v. Flota Merchante Grancolombiana, S.A.,* 553 F.2d 837, 838 (2d Cir. 1977). The comparison, even after the Congress' attempt to clarify matters in the 1972 amendments to the Act, remains apt.

2. The plaintiff testified in Spanish and "canal" was apparently a Spanish expression, interpreted by the translator to mean a "pond" or "channel." Plaintiff also drew a picture to illustrate his testimony that indicated that he was saying there was a depression or dent in the top of the container from which he fell.

The defendant's position was that such inspection procedures, even if used by the ship in this case, would have been ineffective because of distance, the obstruction of the bridge's wind screen, and the difficulty of viewing the top of the containers under the lighting conditions that existed on the night of the accident. It was also defendant's position that if a ship's officer could have made effective inspections of containers from the bridge, the plaintiff surely could have seen such a dent or depression in the top of the very container upon which he was standing and, therefore, must have been negligent himself. It appeared from the evidence that this particular container had been lifted aboard the American Accord about thirty minutes before the accident occurred. The container had been loaded in the normal way. It was brought to the pier on a truck, inspected by the terminal operator, and then hoisted aboard with a large crane operated by stevedores.

The Court charged the jury under traditional negligence principles that the defendant was negligent if it knew or should have known about any unreasonably dangerous defect in the container, and failed to take steps to correct the defect or warn the plaintiff of its existence. The jury, after a brief deliberation, found the shipowner negligent and the plaintiff free from fault, and awarded the verdict in plaintiff's favor.

## II.

Plaintiff's action against the shipowner is governed by the Longshoremen's and Harbor Workers' Compensation Act, parts of which were amended by Congress in 1972.

Pub.L.No.92–576, 86 Stat. 1251, *amending* 33 U.S.C. §§ 901–50 (1970). The 1972 amendments have inspired a rich array of commentary analyzing the history of the Act and the legislative intent behind the changes, and such a detailed discussion of the background is not warranted here.[3] One of the more succinct explanations of the 1972 amendments was made by the court in *Ramirez v. Toko Kaiun K.K.,* 385 F.Supp. 644, 650 (N.D.Cal.1974):

"Under the plan as formulated by Congress, the longshoreman lost his claim against the vessel under the warranty of seaworthiness allowed by *Sieracki* [*Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946)], and in return was granted much higher compensation benefits. The stevedoring company that employs the longshoreman was forced to pay the higher workmen's compensation benefits, but was relieved of liability from *Ryan* -type [*Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1955)] indemnity suits brought by the vessel. The vessel lost its indemnity rights against the stevedoring company, but had its liability to longshoremen limited to cases where its negligence can be proved."

*See also Munoz v. Flota Merchante Grancolombiana, S.A.,* 553 F.2d 837, 839–40 (2d Cir. 1977).

The specific section of the amended Act at issue in this case is section 905(b), which governs the longshoreman's action against the shipowner for negligence.[4] The section provides:

---

**3.** *See, e. g.,* Robertson, *Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* 41 Tenn. L.Rev. 773 (1974); Thompson, *Duty Owed by Ship-Owner Under 1972 Amendments to Longshoremen's Act is That of Land Based Premises Owner to Business Invitee,* 6 J. Maritime L. 643 (1975); Note, *The Injured Longshoreman vs. the Shipowner After 1972; Business Invitees, Land-Based Standards, and Assumption of Risk,* 28 Hastings L.J. 771 (1977). *See also* G. Gilmore & C. Black, *The Law of Admiralty* 449–55 (2d ed. 1975); 1A E. Jhirad, *Benedict on Admiralty,* §§ 28, 111–20 (7th ed. 1973).

**4.** Of course, in the instant case, the plaintiff is not a longshoreman employee of the stevedore, but the employee of A. G. Maintenance, experts in lashing. The parties have not attempted to argue, however, that this plaintiff should be treated differently under the statute. Indeed, it would seem that the issues raised here are identical in all material respects to those in the more frequent longshoreman versus shipowner cases, and the Court's analysis of the standard of care assumes this identity of issues.

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

33 U.S.C. § 905(b) (Supp. V 1975).

The statute does not set out a specific standard of care, and it is clear from the legislative history that "land-based" principles of tort law are to be applied by the courts in developing an appropriate body of case law governing the relationship between shipowner and longshoreman. H.R.Rep.No.1441, 92d Cong., 2d Sess. (1972), reprinted in [1972] 3 U.S.Code Cong. & Admin.News, pp. 4698, 4702–04. The statute itself is clear in providing that the shipowner is no longer to be the insurer of longshoremen's safety and is not to be vicariously liable for the negligence of the stevedore employer.

In line with the congressional intent, the courts have uniformly agreed that the standard of care applicable to shipowners should be analyzed "afresh," with traditional tort principles used as a source in the analytical development. *See, e. g., Hurst v. Triad Shipping Co.,* 554 F.2d 1237, 1246 & n.23 (3d Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Gay v. Ocean Transport & Trading Co.,* 546 F.2d 1233, 1237–38 (5th Cir. 1977); *Napoli v. [Transpacific Carriers, etc.] Hellenic Lines, Ltd.,* 536 F.2d 505, 507 (2d Cir. 1976); *Bess v. Agromar Line,* 518 F.2d 738, 741 (4th Cir. 1975). Although the courts have also uniformly turned to the Restatement (Second) of Torts (1965) for guidance in devising a proper standard of care, that is, unfortunately, where the unanimity ends.

Some courts have used sections 343 and 343A of the Restatement and treated the shipowner as a possessor of land with a duty to warn his "invitees" (the longshoremen) of all but obvious unreasonably dangerous conditions existing on the premises (the ship).[5] *See, e. g., Napoli v. [Transpacific Carriers, etc.] Hellenic Lines, Ltd., su-*

5. Sections 343 and 343A, in Title E of the Restatement (Second) of Torts provide:

TITLE E. SPECIAL LIABILITY OF POSSESSORS OF LAND TO INVITEES

§ 343. Dangerous Conditions Known to or Discoverable by Possessor
A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
 (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
 (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

 (c) fails to exercise reasonable care to protect them against the danger.
§ 343A. Known or Obvious Dangers
(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.
(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.

pra; *Frasca v. Prudential-Grace Lines, Inc.,* 394 F.Supp. 1092 (D.Md.1975). This approach has been criticized because it concededly incorporates into the standard of care elements of assumption of risk and contributory negligence explicitly disavowed by Congress in amending the Act. *Compare* Restatement (Second) of Torts § 343, comment d; id. § 343A, comment d, with H.R. Rep.No.1441, 92d Cong., 2d Sess. (1972), reprinted in [1972] 3 U.S.Code Cong. & Admin.News, p. 4705. Under section 905(b), a defendant's liability may be reduced by the comparative fault of the plaintiff, but the defenses of contributory negligence and assumption of risk are abolished. Therefore, it may be that the section 343 standard, which incorporates the "obviousness" of the defect into the standard to be applied to the possessor, is improper in this context. *See Hurst v. Triad Shipping Co.,* 554 F.2d at 1249–50 n.35; *Brown v. Ivarans Rederi A/S,* 545 F.2d 854, 863–64 n.10 (3rd Cir. 1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Gallardo v. Westfal-Larsen & Co.,* 435 F.Supp. 484, 494 (N.D.Cal.1977).

 In addition to this theoretical inconsistency, sections 343 and 343A of the Restatement are also inapplicable in that they fail to distinguish between dangerous conditions existing on the ship before the longshoremen come aboard, and those which arise during the loading or unloading operations. While it is generally agreed

that the shipowner has an initial duty to furnish a reasonably safe place for the longshoremen to work, the legislative history of the amendments, and indeed the statute itself, clearly place the primary burden of safety precaution on the stevedore employer once the loading and unloading begin. *Riddle v. Exxon Transportation Co.,* 563 F.2d 1103, 1109–10 (4th Cir. 1977); *Brown v. Ivarans Rederi A/S,* 545 F.2d at 860–61. *See* S.Rep.No.1125, 92d Cong., 2d Sess. 2 (1972); 33 U.S.C. § 941(a) (1970).[6] It is clear that Congress thought that the stevedore employer was best able to guard against unreasonable risks arising during stevedoring operations, and that as a result, the shipowner's duty, once the stevedoring operation begins, should be treated differently from its duty initially to provide a safe place to work. Therefore, sections 343 and 343A, which state a general duty to warn of unreasonably dangerous conditions which the possessor either knows or should know about, do not sufficiently make this distinction, because they place on the shipowner the same responsibility to supervise the stevedoring activity as to inspect its own ship before turning it over to the stevedores.

This problem with sections 343 and 343A is reflected by the applicable cases decided by the Second Circuit Court of Appeals. Since the initial use of the possessor-invitee theory in *Napoli, supra,* the Second Circuit has twice dealt with the question of the

---

**6.** *See also* the Occupational Safety and Health Act Regulations for Longshoring, 29 C.F.R. §§ 1918.1 *et seq.,* which generally apply only to stevedore companies. *See Gay v. Ocean Transport & Trading Co.,* 546 F.2d 1233 (5th Cir. 1977); *Croshaw v. Koninklijke Nedlloyd, B.V. Rijswijk,* 398 F.Supp. 1224 (D.Or.1975). *See also Gallardo v. Westfal-Larsen & Co.,* 435 F.Supp. at 498–500.

The Senate Report noted that the primary focus in the effort to ensure safety for longshoremen was the creation of a strong workmen's compensation scheme for stevedore employees:

"It is important to note that adequate workmen's compensation benefits are not only essential to meeting the needs of the injured employee and his family, but, by assuring that the employer bears the cost of unsafe conditions, serve to strengthen the employer's incentive to provide the fullest measure of on-the-job safety.

This consideration is particularly crucial with respect to high-risk occupations such as those covered by this Act. Longshoring, for example, has an injury frequency rate which is well over four times the average for manufacturing operations. It is the Committee's view that every appropriate means be applied toward improving the tragic and intolerable conditions which take such a heavy toll upon workers' lives and bodies. in this industry, and such means clearly include vigorous enforcement of the Maritime Safety Amendments of 1958 and the Occupational Safety and Health Act of 1970, as well as a workmen's compensation system which maximizes industry's motivation to bring about such an improvement."

S.Rep.No.1125, 92d Cong., 2d Sess. 2 (1972).

proper standard of care, and has implicitly distinguished situations in which the dangerous condition causing the accident arose during loading or unloading.

In *Munoz v. Flota Merchante Grancolombiana, S.A.,* 553 F.2d 837 (2d Cir. 1977), the injury resulted from the improper manner in which cargo had been stowed by the stevedores. A jury found the owner negligent in not adequately supervising the longshoremen's procedures, apparently on the instruction that if the owner either knew or should have known of the dangerous condition, it was negligent in not correcting it or warning the longshoremen of it. Writing for the court, Chief Judge Kaufman noted that there was no evidence "that the shipowner knew of the defect and it is undisputed that the owner delivered the premises to [the stevedores] in a safe condition." *Id.* at 840. Stating that the shipowner "had no duty to supervise the minute details of work totally entrusted to the competence of the stevedore," *id.,* the court held that a refusal to grant judgment notwithstanding the verdict would contravene the intent of the 1972 amendments:

"The appellee argues, however, that the shipowner in the exercise of reasonable care should have discovered and corrected the hidden defect in the stevedore's makeshift pathway leading to the escape hatch that caused Munoz's fall. We reject this contention which is reminiscent of the claims asserted prior to 1972 and which in great measure led to amendment of the Act. It would portend a return to the era of 'non-delegable duty' that was so unceremoniously ushered out by Congress only five years ago. Indeed, if Munoz's recovery were allowed to stand, the overriding congressional concern for safety in the industry would be set at naught. Since the stowing of cargo in the lower hold of the CIUDAD DE IBAQUE was peculiarly the responsibility of UMS, we would be remiss in our duty to other harbor workers if we re-

quired the owner to pay for the stevedore's negligence. All incentives for the stevedore to monitor unsafe procedures then would be lost for under the Act the stevedore is immune from indemnity actions."

*Id.* at 841. The court went on to distinguish *Napoli* on the ground that *Napoli* was concerned with an "obvious" dangerous condition (snow accumulation), while *Munoz* dealt with a "latent" defect created by the improper stowing procedures. *Id.*

■ Through its use of this "latent-obvious" dichotomy, the *Munoz* court recognized that the primary responsibility for ensuring safety, once loading begins, is to fall on the stevedore, and any standard of care that imposes a duty on the shipowner to supervise the longshoremen's work is tantamount to a return to the "non-delegable duty" theory specifically rejected by Congress in the 1972 amendments. As such, *Munoz* at least implicitly supported an alternative theory of liability embodied in section 409 of the Restatement—a theory providing that the employer is generally not liable for the acts of an independent contractor.[7]

This independent contractor theory has also been used by courts expressly rejecting the possessor-invitee theory of *Napoli. See, e. g., Hurst v. Triad Shipping Co.,* 554 F.2d 1237 (3d Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Teofilovich v. d'Amico Mediterranean Pacific Line,* 415 F.Supp. 732 (C.D.Cal.1976); *cf. Cummings v. "Sidarma" Soc.,* 409 F.Supp. 869 (E.D.La.1976); *Croshaw v. Koninklijke Nedlloyd, B.V. Rijswijk,* 398 F.Supp. 1224 (D.Or.1975). More recently, this independent contractor approach was implied by the latest treatment of the issue by the Second Circuit, in *Ruffino v. Scindia Steam Navigation Co.,* 559 F.2d 861 (2d Cir. 1977). In *Ruffino,* a "latent" defect in the stowage, created by foreign stevedores in loading the cargo, caused an injury to an American stevedore taking part in unloading the

---

7. Restatement (Second) of Torts § 409 (1965) states:

"Except as stated in §§ 410–29, the employer of an independent contractor is not liable for

physical harm caused to another by an act or omission of the contractor or his servants."

cargo. Citing *Munoz* and Restatement (Second) § 409, the court affirmed a directed verdict for the shipowner and stated that the owner could not be liable for the acts of an independent contractor. The court also noted that there was no evidence to support an inference that the shipowner knew or should have known of the latent defect. *Id.* at 862–63.

■ The difficulty with applying the Second Circuit cases to the instant case lies in the Second Circuit's distinctions between "obvious" and "latent" defects. It seems clear that the jury in *Ruffino* could have found that the shipowner acted unreasonably in not inspecting the cargo loaded overseas, and, therefore, should have known of the stowage defect. Yet the court held that a directed verdict was proper because the defect was "latent", like the one in *Munoz,* and not "obvious", like the one in *Napoli.* Similarly, in *Munoz,* the jury did find the owner negligent in not inspecting the work of the stevedores, but the court held no liability could attach for the failure to perceive a "latent" defect created by the longshoremen themselves. In the instant case, the alleged dent or depression in the top of the container cannot be termed "latent" since any such dent would have been seen by anyone who looked at the top of the container. There was, however, no evidence that anyone, including the plaintiff, actually saw such a dent. As a result, the labels of "latent" or "obvious" are not easily applied in this case.

It is also not at all clear that the independent contractor approach suggested by *Ruffino,* and used expressly by other courts, would be proper here. Initially, it is not clear that the defect in the container was caused by "an act or omission" of the stevedore. Even if the stevedore could be found negligent in creating this defect, that does

not mean that the shipowner could not be found concurrently negligent if, in the exercise of reasonable care, it should have inspected the container and warned the longshoremen of the defect. While it is clear from the statute that the owner is not to be charged with the stevedore's negligence, *see* 33 U.S.C. § 905(b) *supra,* any inquiry which focused solely on the behavior of the stevedore in order to determine the liability of the shipowner would be misplaced. To decide the case under this approach would require a finding that the stevedore's negligence was the sole cause of the accident, and that the owner was not a concurrent and independent tortfeasor. Thus, this would entail an investigation into the reasonableness of the stevedore's loading and inspection procedures, and this kind of inquiry seems totally unnecessary and unwarranted in determining the liability of the shipowner.[8]

■ A more appropriate mechanism for distinguishing the shipowner's duty during the stevedoring operation from its duty to provide a reasonably safe place to work is the type of knowledge necessary to support liability. *See Gallardo v. Westfal-Larsen & Co.,* 435 F.Supp. 484 (N.D.Cal.1977); Note, *The Injured Longshoreman vs. The Shipowner After 1972: Business Invitees, Land-Based Standards, and Assumption of Risk,* 29 Hastings L.J. 771, 790–92 (1977). The Court agrees with the opinion of the court in *Gallardo, supra,* which eschewed unnecessarily complex land-based concepts of tort law in favor of a clearly stated standard of conduct designed specifically for actions by longshoremen against shipowners. The standard suggested by the *Gallardo* court is:

"Before the commencement of stevedoring operations, the owner of a vessel

8. The issue as to the proper role of the stevedore's negligence in measuring the liability of the shipowner for its own negligence has also led to differing points of view on whether the shipowner should be permitted to reduce its liability by allocating the total damages between it and the stevedore. *See Dodge v. Mitsui Shintaku Ginko K.K. Tokyo,* 528 F.2d 669

(9th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). *See generally* R. Coleman & W. Daley, *Equitable Credit: Apportionment of Damages According to Fault in Tripartite Litigation Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* 35 Md.L.Rev. 351 (1976).

in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual or constructive knowledge. After the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual knowledge."

435 F.Supp. at 490.

This standard distinguishes between the shipowner's different roles by limiting the owner's liability for injuries caused by defects or dangerous conditions arising during stevedoring operations. In order to be liable for the failure to remedy such dangerous conditions, the owner must have actual knowledge of the dangerous condition. It is apparent that the standard comports with the intent of the 1972 amendments that the stevedore employer is to bear the primary burden of taking safety precautions during unloading and loading of cargo. The standard places upon the shipowner the initial duty to provide a reasonably safe place to work, as the owner will be liable for any unreasonable risks of which it knows or should know to exist at the time the stevedoring operations begin. The standard also does not relieve the owner from liability if, in the course of its supervisory activity, it gains actual knowledge of an unreasonably dangerous condition, and fails to take steps to correct it.

It also seems clear that this standard does not differ in result from most of the relevant cases attempting to delineate the proper standard of care to be applied to shipowners. In *Napoli, supra,* for instance, the dangerous condition was "obvious", and the owner had actual knowledge of it. *See also*

*Lubrano v. Royal Netherlands Steamship Co.,* 430 F.Supp. 527 (S.D.N.Y.1977), where the owner obtained actual knowledge of a danger arising during stevedoring operations and gave a warning. The Court directed a verdict for the shipowner.

Similarly, in *Munoz, supra,* the decision in favor of the shipowner was supported by the absence of evidence indicating that the owner had actual knowledge of the "latent" defect created by the stevedores. The effect of the *Munoz* holding is that the owner cannot be imposed with a duty to inspect and supervise stevedoring procedures, and cannot be liable for accidents caused by defects of which it has only constructive knowledge. Other recent cases have also arrived at similar results and support the view that the owner does not have a general duty to oversee loading and unloading operations.[9]

Moreover, adoption of this straightforward standard is supported by the opinion of the Supreme Court in *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959), in which the Court refused to import into maritime practice distinctions of the common law not necessary to a proper maritime standard of care:

> "For the admiralty law at this late date to import such conceptual distinctions would be foreign to its traditions of simplicity and practicality. . . . The incorporation of such concepts appears particularly unwarranted when it is remembered that they originated under a legal system in which status depended almost entirely upon the nature of the individual's estate with respect to real property, a legal system in that respect entirely alien to the law of the sea."

---

**9.** *See Riddle v. Exxon Transportation Co.,* 563 F.2d 1103, 1115 (4th Cir. 1977) (dangerous condition was "due to the negligence of the stevedore or shipyard without the knowledge or participation of the shipowner."); *Arroyo v. Frota Oceanica Brasiliera, S.A.,* 75 Civ. 2609 (S.D.N.Y. Sept. 15, 1977) (shipowner had not undertaken duty to inspect work area during loading—no actual knowledge of dangerous

condition); *Valle v. Jugoslavenska Linejska Plovidba,* 434 F.Supp. 608 (S.D.N.Y.1977) (no duty to inspect details of loading—no actual knowledge of defect). Although these cases do not expressly use the suggested standard that focuses on the knowledge of the owner, the result in each of them could have been more directly obtained through the application of such a standard.

*Id.* at 631–32, 79 S.Ct. at 410. *See also Frasca v. Prudential-Grace Lines, Inc.,* 394 F.Supp. at 1100.[10]

Finally, the standard suggested here does not conflict with the essential elements of the theories used by courts thus far in developing the proper standard to be applied to shipowners under the amended Act. The standard recognizes the duty of the owner to furnish a safe place for the longshoremen to work, similar to that set forth in Restatement (Second) of Torts §§ 343 and 343A. It also recognizes the lowering of that standard once stevedoring operations have begun, and, in so doing, incorporates the essential components of the independent contractor theory of Restatement (Second) of Tort § 409. At the same time, the suggested standard does not carry with it any of the unnecessary baggage of the common law such as the "latent-obvious" dichotomy, *see Darwin v. United States,* 435 F.Supp. 501, 510–11 (N.D.Cal.1977), or all of the exceptions to the rule of the employer's liability for acts of the independent contractor under the Restatement. *See* Restatement (Second) of Torts §§ 410–29 (1965). Although the standard requires actual knowledge once stevedoring operations have begun, it clearly will not result in a total abdication by the owner of any supervisory role. The owner has other obligations to clients and crew members which will undoubtedly continue to result in a limited supervisory function for the owner. When, in the course of pursuing such a role, the owner gains actual knowledge of a dangerous condition, a duty to take corrective action will arise. For all of these reasons, the Court agrees with the opinion in *Gallardo, supra,* that the suggested standard comports with existing custom in the shipping industry and is a precise and clear statement of the proper principles of liability to be applied in longshoremen's negligence actions under section 905(b) against the shipowner, and one which can be applied with greater precision than the "latent-obvious" approach.[11]

### III.

■ Applying this standard to the instant case, it is clear that the defendant's motion for judgment notwithstanding the verdict must be granted. The injury to plaintiff occurred during the loading of the American Accord, and there was no evidence offered to support any claim that the shipowner's agents had actual knowledge of the alleged depression or dent in the top of the container. Under these circumstances, the shipowner cannot be liable. Further, there is no need for a new trial since absolutely no evidence of actual knowledge was presented by the plaintiff.

■ This result is likewise supported by the legislative intent that the primary responsibility for guarding against unreasonable risks during loading and unloading should be carried by the stevedore employer. A duty placed on the shipowner to inspect each container as it came aboard

10. The Court is aware that the wisdom of *Kermarec* was offered before the 1972 amendments at issue in this case, in which the Congress directed that "land-based" principles be used by courts interpreting § 905(b). The allusion to "land-based" principles, however, cannot support the blind importation of all common law tort concepts into a negligence theory for longshoremen. The Court assumes that the "land-based" direction in this context leaves room for creative judicial development of a negligence standard sensitive to the overall scheme of the amended Act and the realities of the shipping industry.

1. It should be noted that the standard suggested and applied here is directed only at cases involving dangerous conditions arising during longshoring operations which cause injuries during the same period. The standard does not necessarily apply in cases where the defect arises during stevedoring operations at another time or port (*e. g.,* in loading) and then causes an injury later (*e. g.,* in unloading). *Cf. Ruffino v. Scindia Steam Navigation Co.,* 559 F.2d 861 (2d Cir. 1977) (defect arising in foreign port); *Valle v. Jugoslavenska Linejska Plovidba,* 434 F.Supp. 608 (S.D.N.Y.1977) (defect arising during course of voyage). In that situation, it may well be that the owner's duty to inspect cargo during the course of a voyage might allow liability based on constructive knowledge, or that a "latent-obvious" dichotomy could be useful in developing an appropriate standard of care. These issues, of course, are not presented in the instant case.

and otherwise involve ship's personnel in the detailed control of the stevedore's activity would not be proper under the statutory scheme as amended. *See Hurst v. Triad Shipping Co.,* 554 F.2d at 1250 & n.36; *Munoz v. Flota Merchante Grancolombiana, S.A.,* 553 F.2d at 841; *Gallardo v. Westfal-Larsen & Co.,* 435 F.Supp. at 496; Note, *The Injured Longshoreman vs. The Shipowner After 1972: Business Invitees, Land-Based Standards and Assumption of Risk,* 28 Hastings L.J. at 790–92.

For these reasons, the defendant's motion for judgment notwithstanding the verdict is hereby granted, and the complaint is dismissed.

SO ORDERED.